**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DAVID JACOBS and GARY HINDES, on behalf of themselves and all others similarly situated, and derivatively on behalf of the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation,<br><br>                  *Plaintiffs,*<br><br>   v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, and THE UNITED STATES DEPARTMENT OF THE TREASURY,<br><br>                *Defendants,*<br><br>   and<br><br>THE FEDERAL NATIONAL MORTGAGE ASSOCIATION and THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>                *Nominal Defendants.* | Civil Action No.:<br><br><br><br><br><br>**CLASS ACTION**<br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION AND DERIVATIVE COMPLAINT**

Plaintiffs David Jacobs and Gary Hindes, on behalf of themselves and all others similarly situated, and derivatively on behalf of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, by and through their undersigned counsel, submit this Class Action and Derivative Complaint against Defendants Federal Housing Finance Agency, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, and the United States Department of the Treasury.

## NATURE AND SUMMARY OF THE ACTION

1.      This case about Delaware and Virginia corporate law is a class action brought by Plaintiffs on behalf of themselves and several classes (the "Classes," as defined herein) of holders of preferred and common stock issued by either the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac," and, together with Fannie Mae, the "Companies"), seeking damages and equitable relief, including rescission and restitution, and a derivative action brought by Plaintiff Jacobs on behalf of Fannie Mae and Freddie Mac, seeking damages and equitable relief, including rescission and restitution, in each case in connection with the Third Amendments to the Amended and Restated Senior Preferred Stock Purchase Agreements, dated August 17, 2012 (the "Net Worth Sweep"), between Defendant United States Department of the Treasury ("Treasury") and Defendant Federal Housing Finance Agency ("FHFA"), in its capacity as conservator of Fannie Mae and Freddie Mac.  Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.

2.      Fannie Mae and Freddie Mac are privately owned, publicly traded companies chartered by the United States Congress.  Fannie Mae's bylaws designate that the Delaware General Corporation Law ("DGCL") controls for purposes of its corporate governance practices and procedures, and Freddie Mac similarly has designated the Virginia Stock Corporation Act ("VSCA"), each to the extent not inconsistent with the Company's enabling legislation and other federal laws, rules and regulations.  12 C.F.R. § 1710.10. There is no federal corporate law applicable to Fannie Mae or Freddie Mac or the corporate law issues this complaint raises, other than Delaware and Virginia law as so incorporated.

3.      Although both Fannie Mae and Freddie Mac were chartered by the United States Congress, the federal government did not guarantee, directly or indirectly, the securities or other obligations of Fannie Mae or Freddie Mac.  The Companies are stockholder-owned corporations, and the Companies' public disclosures indicated that clearly to investors.   Until the conservatorship discussed below, the Companies' businesses were self-sustaining, consistently profitable, and funded exclusively with private capital raised through the issuance of several classes of stock, including the stock purchased by Plaintiffs and the other members of the Classes.

4.      In July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA").  HERA created FHFA to replace the Companies' prior regulator and authorized FHFA to appoint itself as conservator or receiver of the Companies in certain statutorily specified circumstances.  HERA left in place the federal charters of the Companies and did not alter the provisions of their bylaws, implemented pursuant to federal law, specifying that Delaware and Virginia law apply for corporate governance purposes.  Also in July 2008, James Lockhart, Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") and subsequently the Director of FHFA, stated that the Companies were "adequately capitalized" and both Henry Paulson, then-Treasury Secretary, and Benjamin Bernanke, then-Chairman of the Federal Reserve, testified before Congress that each Company was "adequately capitalized."

5.      Less than two months after HERA was passed and federal regulators declared publicly that the Companies were adequately capitalized, FHFA placed the Companies under conservatorship and appointed itself as conservator of the Companies.   When the conservatorships were announced, FHFA claimed that its goal was to return the Companies to normal business operations, and that once the Companies had been restored to a safe and solvent

3

condition, the conservatorships would be terminated.  The conservatorships did not alter the rights or privileges of the common or  preferred stock under the charters of the Companies or Delaware or Virginia law, and the Companies made public statements at the time to the effect that the Companies' common and preferred stock would continue to remain outstanding.

6.      The common and preferred stock of the Companies have continued to trade publicly since the commencement of the conservatorships, and the Companies have filed periodic reports under the Securities and Exchange Act of 1934, as amended.

7.      When they agreed to conservatorship, the boards of Fannie Mae and Freddie Mac ceded control of the assets and powers of the Companies to FHFA as conservator.  Fannie Mae and Freddie Mac each continues to have "boards of directors" in name, but these boards were appointed by FHFA, they report only to the conservator, and they contend (erroneously) that they owe duties only to the conservator.  As conservator, FHFA has ultimate responsibility for, and sole control of, the affairs of Fannie Mae and Freddie Mac so long as the conservatorships continue.

8.      The day after the conservatorships were imposed, Treasury exercised its temporary authority under HERA to enter into two virtually identical senior preferred stock purchase agreements with FHFA to purchase Fannie Mae and Freddie Mac securities (the "PSPAs").  Fannie Mae and Freddie Mac each issued a newly created series of Senior Preferred Stock, and in return for Treasury's commitment to purchase this stock, Treasury received $1 billion of Senior Preferred Stock from each of the Companies and also received warrants to acquire 79.9% of each of Fannie Mae's and Freddie Mac's common stock at a nominal price. Treasury also established a $100 billion lending facility for each of the Companies (each later increased in size by two subsequent amendments to the PSPAs, first to $200 billion each and

then to an amount established by a formula that may be greater (but not less) than $200 billion each, adjusting for the amount of any deficiencies experienced by the Companies in 2010, 2011, and 2012 and any surplus existing as of December 31, 2012).  Pursuant to the lending facilities, Treasury would make quarterly purchases of Senior Preferred Stock from each of the Companies so as to ensure that each Company's liabilities did not exceed its assets.  Each time Fannie Mae or Freddie Mac draws on the Treasury lending facility, the aggregate liquidation preference of the Company's Senior Preferred Stock increases by the sum of all additional amounts paid by Treasury to the Company pursuant to the draw.  The newly issued Senior Preferred Stock of each of the Companies ranked senior to all other classes and series of stock and entitled Treasury to receive either a cumulative cash dividend of 10% of the "outstanding liquidation preference," or an "in kind" stock dividend equal to 12%, which amount would be added to the liquidation preference.  The terms of the Senior Preferred Stock thus gave Fannie Mae and Freddie Mac the discretion to pay dividends in kind rather than in cash.

9.     The Senior Preferred Stock of each Company has an aggregate liquidation preference equal to $1 billion (1 million shares at $1,000 per share) plus the sum of all additional amounts drawn by each Company on Treasury's funding commitment.  The warrants provided Treasury with an "upside" return on its investment in each Company, beyond the 10% cash or 12% in-kind dividend on the Senior Preferred Stock, so as to allow Treasury to capitalize from its investments in each Company if they returned to profitability.

10.     Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and

Treasury's influence over FHFA officials, many of whom were employees of Treasury.  With such de facto power over the Companies' financial condition and operations, Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.

11.     Delaware law applies to the Senior Preferred Stock issued by Fannie Mae under the terms of Fannie Mae's bylaws and the Amended and Restated Certificate of Designation of Terms of the Senior Preferred Stock.  Virginia law applies to the Senior Preferred Stock issued by Freddie Mac under the terms of Freddie Mac's bylaws and the Amended and Restated Certificate of Designation of Terms of the Senior Preferred Stock.  The Amended and Restated Certificate of Designation for the Fannie Mae Senior Preferred Stock that Treasury purchased from Fannie Mae states that it "shall be construed in accordance with and governed by the laws of the United States, provided that the law of the State of Delaware shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of [the] Certificate."  The Amended and Restated Certificate of Designation for the Freddie Mac Senior Preferred Stock contains identical language, with "the law of the Commonwealth of Virginia" in place of "the law of the State of Delaware." Thus, when interpreting the terms of Treasury's Fannie Mae and Freddie Mac Senior Preferred Stock, federal law incorporates the law of the State of Delaware and the Commonwealth of Virginia, respectively.

12.     Soon after the commencement of the conservatorships, FHFA took two steps that required each Company to issue billions of dollars in Senior Preferred Stock to Treasury.  First, the Companies were forced to declare substantial non-cash accounting losses, including write-downs of the value of their tax assets and loss reserves.  Second, unusually for a conservator of

companies taking write-downs, FHFA also elected to have the Companies pay Treasury discretionary dividends on the Senior Preferred Stock to Treasury in cash (rather than in kind), resulting in the Companies needing additional incremental capital to fund the cash dividend payments.

13.     FHFA's accounting treatment of Fannie Mae's and Freddie Mac's deferred tax assets created a windfall for Treasury.  At the commencement of the conservatorships, Fannie Mae and Freddie Mac carried large deferred tax assets on their balance sheets.  As conservator, FHFA established "valuation allowances" at Fannie Mae and Freddie Mac to offset the value of these deferred tax assets on the theory that Fannie Mae and Freddie Mac were unlikely to be profitable enough in the future to use them.  The valuation allowances created paper losses that required the Companies to draw significant amounts of capital from Treasury at the high agreed-upon dividend rates, thus increasing the value of Treasury's liquidation preference.  The Companies' valuation allowances eventually reached a combined amount of approximately $100 billion.  These allowances, together with 10% cash dividends on the capital drawn, represented the substantial majority of Treasury's Senior Preferred Stock investment.

14.     By mid-2012, Fannie Mae and Freddie Mac began to experience a vigorous recovery, pulling in profits of $7.8 billion and $3.5 billion, respectively, in the first half of the year alone.  In 2012, it also became clear that many of FHFA's early write-downs, including valuation allowances for deferred tax assets, would soon be reversed and generate massive profits.  Given the return to profitability, it became evident that those valuation allowances would likely be reversed, a decision that would add tens of billions of dollars to the Companies' balance sheets and eventually generate cash available for distribution to stockholders other than Treasury after paying Treasury its dividends on account of the Senior Preferred Stock.

15.     Rather than use the valuation allowances to build capital and stabilize the Companies' balance sheets, FHFA, at the direction of Treasury, came up with a plan that would give Treasury, and no other stockholders in the Companies, the benefit of this new profitability in the form of cash payments, all without reducing the value of Treasury's liquidation preference by a single dollar.  The government called the plan the "Net Worth Sweep."  In August 2012, just days after Fannie Mae and Freddie Mac had announced their earnings for the second quarter, FHFA entered into a third amendment of each of the Amended and Restated Senior Preferred Stock Purchase Agreements (the "Third Amendment") and agreed to amend the Fannie Mae and Freddie Mac Senior Preferred Stock Certificates of Designation.  These amendments changed the preferred dividend on Treasury's Senior Preferred Stock in the Companies from one payable at the previously established 10% cash (and 12% in-kind) rate to a perpetual quarterly "dividend" equal to the entire positive net worth of each of Fannie Mae and Freddie Mac (with the exception of a $3 billion capital reserve amount for each Company for 2013, gradually decreasing to zero for each Company on January 1, 2018).  The Companies and their private stockholders received no additional investments or value of any sort in exchange for entering into the Net Worth Sweep.

16.     The Net Worth Sweep circumvented the rules of priority under the charters of each Company and expropriated for the government the remaining value of the preferred stock and common stock still held by private investors.  Treasury and FHFA have both acknowledged that, under this unprecedented structure, ***Treasury will receive—in perpetuity—any and all profits that Fannie Mae and Freddie Mac earn***.  Thus, it will be impossible for either Company to ever have a positive net worth, to ever pay a dividend on account of another class or series of stock, or to ever emerge from conservatorship and return to private market control.

17.     Treasury has already reaped enormous benefits from the Net Worth Sweep. Following their planned September 2015 "dividend" payments to Treasury of $4.4 billion and $3.9 billion, respectively, Fannie Mae and Freddie Mac will have paid ***$142.5 billion*** and ***$96.5 billion*** to Treasury, respectively (including both cash dividends previously paid at the 10% rate and amounts paid pursuant to the Net Worth Sweep).  Yet Treasury and FHFA maintain that these payments represent earnings on Treasury's investment, rather than a return of capital invested, such that the liquidation preference of the Fannie Mae and Freddie Mac Senior Preferred Stock has not changed and remains at $117.1 billion and $72.3 billion, respectively.

18.     The Net Worth Sweep has stripped Fannie Mae and Freddie Mac of their ability to rebuild their capital reserves or to ever again distribute dividends or otherwise deliver any value to Plaintiffs or the other members of the Classes holding stock in the Companies. Furthermore, neither Fannie Mae nor Freddie Mac is permitted to redeem Treasury's Senior Preferred Stock.  Moreover, by appropriating the entirety of the Companies' net worth for the government's coffers on a quarterly basis in perpetuity, the Net Worth Sweep has effectively eliminated the Classes' contractual and stockholder rights and the economic value of their stock.

19.     Plaintiffs and the other members of the Classes paid valuable consideration in exchange for the Companies' stock in reliance on the legal rights and privileges of these instruments under law.  In doing so, Plaintiffs and the other members of the Classes helped provide financial support for the Companies' businesses both before and after the imposition of the conservatorship.

20.     Fannie Mae's and Freddie Mac's continued profitability over the past few years has enabled them not only to pay out to Treasury an amount equal to all of the money they drew down from Treasury, but also to pay an additional ***$26.4 billion*** and ***$25.2 billion***, respectively

(following the September 2015 "dividend" payments).  But for the Net Worth Sweep, Fannie Mae and Freddie Mac would be capable of paying billions in dollars in profits to the holders of their other classes and series of stock, including Plaintiffs and the other members of the Classes. Due to the Net Worth Sweep, that money will instead accrue to Treasury—*forever*.  Treasury will receive a massive windfall above and beyond its pre-Net Worth Sweep contractual entitlements, and Plaintiffs and the other members of the Classes will receive nothing.

21.     As explained below, the Net Worth Sweep is an illegal term for any preferred stock instrument.  The Net Worth Sweep violates the DGCL and VSCA and therefore is void and unenforceable.  Accordingly, this action seeks, among other things, directly on behalf of the Classes and derivatively on behalf of Fannie Mae and Freddie Mac, a declaration that the Net Worth Sweep is void and unenforceable under Delaware and Virginia law, rescission of the Net Worth Sweep, and an award of compensatory damages to Plaintiffs and the Classes, and to Fannie Mae and Freddie Mac, as well as restitution and disgorgement of the monies paid to Treasury pursuant to the Net Worth Sweep.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1452(c), 1723a(a) and 4617, as well as 28 U.S.C. § 1331.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs.  The Court also has subject matter jurisdiction over claims asserted herein pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because this is an action against agencies of the United States, Plaintiffs reside in this district, and no real property is involved in the action.

## THE PARTIES

24.     Plaintiff David Jacobs, a citizen of Delaware, holds Fannie Mae and Freddie Mac common stock.  Mr. Jacobs also holds Freddie Mac 6.02% Non-Cumulative Perpetual Preferred Stock, Series X (FMCKL), Freddie Mac 5.57% Non-Cumulative Perpetual Preferred Stock, Series V (FMCKM), and Fannie Mae Variable Rate Non-Cumulative Preferred Stock, Series P (FNMAH).  He has been a holder of Fannie Mae and Freddie Mac preferred stock continuously since November 2009, and has continuously held Fannie Mae and Freddie Mac common stock since May 2013 and January 2014, respectively.

25.     Plaintiff Gary Hindes, a citizen of Delaware, has been an investor in Fannie Mae and Freddie Mac since 2011.  He currently holds Freddie Mac common stock, as well as Freddie Mac Fixed-to-Floating Rate Preferred Stock, Series Z (FMCKJ).  He has been a holder of Freddie Mac common and preferred stock continuously since at least February 2015.

11

26.    Defendant FHFA, as conservator of Fannie Mae and Freddie Mac, is an independent agency of the United States government with its headquarters located at Constitution Center, 400 7th Street, S.W., Washington, D.C., 20024.  According to FHFA's strategic plan for fiscal years 2013-17, "[s]ince September 2008, FHFA has been the conservator of [the Companies] ... with responsibility of overseeing management and governance of the Enterprise[s]."

27.    Defendant Treasury is an executive agency of the United States government with its headquarters located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220. Treasury owns Fannie Mae and Freddie Mac Senior Preferred Stock and is a signatory to certain agreements central to this complaint.

28.    Nominal defendant Fannie Mae is a federally chartered, privately owned company with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016.

29.    Nominal defendant Freddie Mac is a federally chartered, privately owned company with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia 22102.

## FACTS

### A. FANNIE MAE AND FREDDIE MAC

30.    Fannie Mae and Freddie Mac are stockholder-owned corporations organized and existing under the Federal National Mortgage Association Charter Act and the Federal Home Loan Mortgage Corporation Act, respectively.  Fannie Mae was established in 1938 as a federal agency to provide the mortgage market with supplemental liquidity, and was converted to a private corporation in 1968.  Freddie Mac was created as an alternative to Fannie Mae to make

the secondary mortgage market more competitive and efficient.  Both Companies are private corporations that Congress created to increase mortgage market liquidity.  They seek to accomplish this by purchasing mortgages that private banks originate and bundling them into mortgage-related securities to be sold to investors.  Through the creation of this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

31.     Notwithstanding the Companies' government charters, private stockholders own Fannie Mae and Freddie Mac.  Before the imposition of the conservatorships in 2008, in the course of their operations as privately owned, for-profit entities, the Companies issued both common stock and several series of preferred stock.  The Companies' securities were considered to be safe investments.  Before 2007, the Companies were consistently profitable.  In fact, prior to that time, the most recent full-year loss for Fannie Mae was in 1985, while Freddie Mac had never experienced an annual loss.  The Companies regularly declared and paid dividends on their common and preferred stock.  Despite the imposition of conservatorships in 2008, the Companies continue to have private stockholders whose ownership interests were not altered by the conservatorships, and who continue to own the Companies alongside Treasury.

32.     Federal law authorizes each of the Companies to designate "the law of the jurisdiction in which [its] principal office . . . is located, [or] . . . [the] Delaware General Corporation Law" for purposes of its corporate governance practices and procedures.  12 C.F.R. § 1710.10.  Fannie Mae has elected Delaware law to apply pursuant to Section 1.05 of its bylaws, which provides, in pertinent part, that "the corporation has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law."  Freddie Mac has elected Virginia law to apply pursuant to Section 11.3 of its bylaws,

13

which provides, in pertinent part, that "the Corporation shall follow the corporate governance practices and procedures of the law of the Commonwealth of Virginia, including without limitation the Virginia Stock Corporation Act as the same may be amended from time to time." Under both Delaware and Virginia law, as applied to Fannie Mae and Freddie Mac, respectively, pursuant to federal law, preferred stock designations are deemed as amendments to a corporation's charter and are therefore generally viewed as contractual in nature.  In addition, directors and officers of corporations owe fiduciary duties to corporate stockholders and to the corporate business entity, and a majority or controlling stockholder owes fiduciary duties to the company and to minority stockholders.

## B. THE COMPANIES ARE PLACED INTO CONSERVATORSHIP

33.    Beginning in 2006, a global financial crisis and nationwide declines in the housing market caused the Companies to suffer losses.  Despite these losses, the Companies remained adequately capitalized and, as described by OFHEO director James Lockhart, "safe and sound."

34.    In July 2008, Congress enacted HERA, establishing FHFA to replace the OFHEO as the Companies' regulator, and granting Treasury temporary authority to assist the Companies through the purchase of securities.  HERA was passed not because Fannie Mae or Freddie Mac was deemed to be insolvent or operating unsafely at that time, but rather to provide the struggling mortgage and financial markets with added confidence.

35.    Despite the Companies being adequately capitalized—indeed, Fannie Mae's and Freddie Mac's assets exceeded their liabilities by *$50 billion* in the aggregate—and operating in a safe and sound fashion, on September 6, 2008, FHFA placed the Companies into conservatorship and, in a press release issued the next day, said that, "as the conservator, FHFA

will assume the power of the Board and management."  According to FHFA's press release, the conservatorship was "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized."  At the time, FHFA also stated that, "the common and all preferred stocks [of the Companies] will continue to remain outstanding."

36.     The very next day, FHFA, acting in its purported capacity as conservator for the Companies, and Treasury entered into two virtually identical senior preferred stock purchase agreements (the PSPAs), pursuant to which each of Fannie Mae and Freddie Mac created and issued a new class of stock, the Senior Preferred Stock.  The Senior Preferred Stock was created pursuant to two virtually identical Senior Preferred Stock Certificates of Designation (one each for Fannie Mae and Freddie Mac) (the "Certificates of Designation") that set forth the rights, powers and preferences of the Senior Preferred Stock.  Treasury purchased 1 million shares of each Company's Senior Preferred Stock in exchange for a funding commitment that allowed each Company to draw up to $100 billion from Treasury (this cap was later increased in size by two subsequent amendments to the PSPAs, first to $200 billion each and then to an amount established by a formula that may be greater (but not less) than $200 billion each, adjusting for the amount of any deficiencies experienced by the Companies in 2010, 2011 and 2012 and any surplus existing as of December 31, 2012).  The 1 million shares of each Company's Senior Preferred Stock have an aggregate liquidation preference equal to $1 billion ($1,000 per share) plus the sum of all additional amounts paid by Treasury pursuant to draws that each Company has made on Treasury's funding commitment.  Treasury, as the holder of the Senior Preferred Stock, also was eligible to receive a cumulative cash dividend of 10% of the outstanding

liquidation preference (12% if the dividend were paid in kind).  Absent the express consent of Treasury and FHFA, Fannie Mae and Freddie Mac generally cannot redeem the Senior Preferred Stock.   Through the PSPAs, Fannie Mae and Freddie Mac also provided Treasury with warrants to purchase 79.9% of their common stock (for virtually no consideration), respectively, and entered into covenants barring the Companies from, among other things, making any changes to their capital structures, paying any dividends (other than to Treasury), or seeking to terminate FHFA's conservatorship without Treasury's approval (so long as the Senior Preferred Stock remained outstanding).

37.     Under the initial PSPAs, Treasury committed to make quarterly payments to the Companies to ensure that the Companies would maintain at least a zero net worth.  Each quarter, FHFA looked to each Company's financial statements to determine if its liabilities exceeded its assets.    If so, FHFA would request that Treasury draw down the Company's funding commitment and provide funds equal to the net worth deficit.  The draws taken by Fannie Mae and Freddie Mac largely were necessitated by the tax write-downs and increases in loss reserves, which had greatly depleted their balance sheets.   As noted, each quarterly payment made pursuant to a draw-down increased the aggregate liquidation preference of the Senior Preferred Stock on a dollar-for-dollar basis.

38.     Soon after the commencement of the conservatorship, FHFA, acting in its purported capacity as conservator of the Companies, declared that the Companies had suffered substantial non-cash accounting losses, which included write-downs of the value of tax assets and loss reserves.  By 2012, it became clear that these projected losses had been overestimated by ***more than $100 billion.***

**C. THE COMPANIES RECOVER AND RETURN TO PROFITABILITY, BUT FHFA AND TREASURY SEIZE ALL OF THEIR NET WORTH AND PROFITS IN PERPETUITY THROUGH THE NET WORTH SWEEP**

39.     Fannie Mae and Freddie Mac returned to profitability in 2012.  That year, Fannie Mae earned $17.2 billion in profits and Freddie Mac earned $11 billion in profits.  The Companies became even more profitable in 2013 ($84 billion and $51.6 billion, respectively) and remained profitable in 2014 ($14.2 billion and $9.4 billion, respectively).

40.     The return of Fannie Mae and Freddie Mac to profitability in 2012 led to a substantial increase in the trading prices of the Companies' preferred stock.

41.     With the Companies having returned to profitability, their stockholders had reason to believe that they would in time regain a return on their investment.  They also had a reasonable expectation that the Companies would eventually be healthy enough to redeem Treasury's Senior Preferred Stock, exit conservatorship, and be "return[ed] to normal business operations," as FHFA's director had vowed when the conservatorships were established.

42.     These reasonable expectations of the Companies' stockholders were soon dashed, however, due to the federal government's self-dealing.  To capitalize on the Companies' strong recovery (and ensure that their stockholders could not capitalize on it), Treasury and FHFA decided to amend the PSPAs such that rather than taking 10% of the liquidation preference as a dividend, Treasury would instead take the entire positive net worth of each of Fannie Mae and Freddie Mac each quarter in perpetuity.  No consideration was paid to the Companies or their stockholders in exchange for the Net Worth Sweep.

43.     Specifically, the Third Amendment to the PSPAs and the corresponding Amended and Restated Senior Preferred Stock Certificates of Designation provide, in pertinent part, as follows:

. . . For each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, ***cumulative*** cash dividends in an amount equal to the then-current Dividend Amount.

* * *

For each Dividend Period from January 1, 2013, through and including December 31, 2017, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount, exceeds zero. ***For each Dividend Period from January 1, 2018, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero.*** In each case, "Net Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP. "Applicable Capital Reserve Amount" means, as of any date of determination, for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; and for each Dividend Period occurring within each 12-month period thereafter, $3,000,000,000 reduced by an equal amount for each such 12-month period through and including December 31, 2017, so that for each Dividend Period from January 1, 2018, the Applicable Capital Reserve Amount shall be zero. For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

(emphasis added).

44.     The above-quoted provisions implement the Net Worth Sweep, by which, from January 1, 2013 through December 31, 2017, each Company pays to Treasury, in the form of a purported "dividend," that particular Company's "Net Worth Amount" (*i.e.*, total assets less total

liabilities) less the "Applicable Capital Reserve Amount" (which starts at $3 billion and decreases to $0 by January 1, 2018). Beginning January 1, 2018 and continuing in perpetuity, the Net Worth Amount will be paid out each quarter to Treasury without any capital reserve whatsoever.

45. The Net Worth Sweep "dividends" are cumulative. If the Net Worth Amount is greater than zero and the board of directors does not declare a "dividend" on the Senior Preferred Stock, then the "dividend" accumulates. Under the Certificates of Designation, no dividends may ever be paid on any other classes or series of stock of either Company unless and until full cumulative "dividends" (*i.e.*, the full Net Worth Sweep amount) are paid on the Senior Preferred Stock pursuant to the Net Worth Sweep. Because the entire net worth of each Company is payable in perpetuity to the Senior Preferred Stock, there necessarily will be no remaining assets from which dividends ever could be paid on other classes or series of stock.

46. The Net Worth Sweep constituted a massive expropriation of value from the Companies and the Classes. While the Companies were on track to repay Treasury and the taxpayers every dollar they were owed with interest, that was not enough for FHFA and Treasury. Rather, FHFA and Treasury chose to seize the totality of the Companies' profits and net worth in perpetuity. The President of the United States' proposed fiscal year 2014 budget estimated that Fannie Mae and Freddie Mac will together pay *$238.5 billion* in dividends to Treasury over the next ten years, far outstripping the government's investments.

47. The Net Worth Sweep has already resulted in historic payments to the Treasury. Following their announced September 2015 "dividends" pursuant to the Net Worth Sweep, Fannie Mae and Freddie Mac will have paid a total of *$142.5 billion* and *$96.5 billion* to Treasury, respectively.

19

48.    However, under the PSPAs, even these substantial payments do not reduce the Companies' obligation to Treasury, since these payments cannot be used to offset prior Treasury draws.   Accordingly, Treasury still maintains a liquidation preference of $117.1 billion with respect to Fannie Mae ($116.1 billion in draw downs plus the initial liquidation preference of $1 billion) and $72.3 billion with respect to Freddie Mac ($71.3 billion in draw-downs plus the initial liquidation preference of $1 billion).   As a result of the Net Worth Sweep, Fannie Mae and Freddie Mac have no way to ever pay down these liquidation preferences, no matter how much cash they contribute to Treasury's coffers.

49.    Following the public announcement of the Net Worth Sweep, the market prices of the Companies' preferred stock suffered dramatic declines.  The Companies' common stock also suffered steep declines in market price.

## D.    THE NET WORTH SWEEP VIOLATES DELAWARE AND VIRGINIA LAW

50.    As noted herein, Delaware and Virginia corporate law are the rules of decision for Fannie Mae and Freddie Mac for corporate governance purposes.

51.    Under Delaware and Virginia corporate law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity.   The Net Worth Sweep represents an unlawful confiscation of the entire economic value of the Companies and their other classes and series of stock.   The Net Worth Sweep is an illegal term for any preferred stock instrument, whether or not held by the federal government.

52.    The Net Worth Sweep violates Section 151(c) of the DGCL, which provides:

> The holders of preferred or special stock of any class or of any series thereof shall be entitled to receive dividends *at such rates*, on such conditions and at such times as shall be stated in the certificate of incorporation or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors as hereinabove provided, ***payable in preference to, or in***

> *such relation to, the dividends payable on any other class or classes or of any other series of stock*, and cumulative or noncumulative as shall be so stated and expressed. When dividends upon the preferred and special stocks, if any, to the extent of the preference to which such stocks are entitled, shall have been paid or declared and set apart for payment, a dividend on the remaining class or classes or series of stock may then be paid out of *the remaining assets of the corporation available for dividends* as elsewhere in this chapter provided.

8 *Del. C.* § 151(c) (emphasis added).

53.      Specifically, the Net Worth Sweep "dividend" is not paid at a "rate" because Treasury's participation in Fannie Mae's (and Freddie Mac's) earnings growth is unlimited, absolute, and perpetual.   While preferred stockholders may have priority over common stockholders in the receipt of dividends, such dividends are necessarily limited as a preference and do not appreciate in an absolute and unlimited manner with the growth of the corporation.

54.      As a result of the Net Worth Sweep, dividends on the Senior Preferred Stock also are not "payable in preference to, or in . . . relation to, the dividends payable on any other class or classes or of any other series of stock[.]"  8 *Del. C.* § 151(c).  Rather, the Net Worth Sweep is payable to the absolute and permanent exclusion of dividends payable on other classes or series of Fannie Mae stock, because, after payment of the Net Worth Sweep each quarter, there are no remaining assets of the Company available for dividends on any other classes or series of stock.

55.      For the same reasons, the Net Worth Sweep violates Virginia law, *see* Va. Code § 13.1-638 (providing that a corporation may authorize "one or more classes or series of shares that . . . **have preference over** any other class or series of shares with respect to distributions [such as dividends]" (emphasis added)), which does not permit corporations to enter into unconditional agreements to pay dividends so as to preclude all other classes and series of stock from the potential to receive dividends in perpetuity.   Virginia law requires that dividend

preferences be "limited" and "definitely fixed," and that dividends paid on preferred stock must be payable "in preference to" the dividends paid on junior stock.  As such, the Net Worth Sweep violates Virginia corporate law applicable to Freddie Mac.

**E.      THE NET WORTH SWEEP ELIMINATES THE CONTRACT RIGHTS OF HOLDERS OF THE COMPANIES' PREFERRED STOCK.**

56.      The Companies have issued common stock and several series of preferred stock that are, as a result of the PSPAs, subordinate to Treasury's Senior Preferred Stock.

57.      The Companies' preferred and common stock, which was issued prior to the issuance of the Senior Preferred Stock to Treasury, is held by private investors such as pension funds, community banks, insurance companies, and individual investors.  Each class and series of preferred stock has its own contractual dividend rate and liquidation value.

58.      Prior to the creation and issuance of the Senior Preferred Stock, each series of Fannie Mae preferred stock ranked on a parity with all other issued and outstanding series of Fannie Mae preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, and each series of Freddie Mac preferred stock ranked on a parity with all other issued and outstanding series of Freddie Mac preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Freddie Mac.  In other words, each series of Fannie Mae and Freddie Mac preferred stock carried equal contractual rights with regards to dividends, and each series of Fannie Mae and Freddie Mac preferred stock carried equal liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac. Prior to the creation and issuance of the Senior Preferred Stock, the Companies regularly declared and paid dividends on each series of their respective preferred stock.

59.     As stated above, under federal law, Delaware law applies to Fannie Mae pursuant to Section 1.05 of its bylaws, and Virginia law applies to Freddie Mac pursuant to Section 11.3 of its bylaws.   Under both Delaware and Virginia law, corporate charter and bylaw provisions are deemed to be contractual in nature, and preferred stock designations are deemed as amendments to a corporation's charter and are therefore also viewed as contractual in nature. Thus, the Certificate of Designation for each series of preferred stock constitutes a contract with provisions governing the holders' dividend and liquidation rights, as well as the holders' voting or consent rights with respect to amendments to the terms of the preferred stock.   Plaintiffs hereby incorporate by reference, as if set forth at length herein, the terms and provisions of the Companies' charters and bylaws, as well as the Certificates of Designation of the Companies' preferred stock.

60.     Through the Net Worth Sweep, FHFA, acting in its purported capacity as conservator of the Companies, eliminated the Companies' preferred stockholders' contractual rights to receive dividends out of lawfully available funds, if and when declared by the Companies' boards, and to receive a pro rata distribution of any liquidation proceeds available after Treasury received full recovery of the face amount of the Senior Preferred Stock.   Thus, the Net Worth Sweep amended, altered, and repealed the terms of the Certificates of Designation, *e.g.*, the contractual terms governing the Companies' preferred stockholders' rights to receive dividends and liquidation distributions, in a manner that materially and adversely affected— indeed, completely destroyed—the rights and interests of the holders of the Companies' preferred stock.   The Net Worth Sweep did not merely give preferential dividend rights to a senior security.   Its terms expropriated all of the net worth of the Companies in perpetuity to the Senior Preferred Stock, thus fundamentally altering and repealing rights, powers, and preferences

of the other series of preferred stock of each corporation.  Indeed, upon entering into the Net

Worth Sweep, Treasury stated that the "quarterly sweep of every dollar of profit that each firm

earns going forward" would make "sure that every dollar of earnings that Fannie Mae and

Freddie Mac generate will be used to benefit taxpayers" and FHFA, in its 2012 report to

Congress, stated that the Net Worth Sweep "ensures all the [Companies'] earnings are used to

benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital."

61.    In addition to their explicit terms, inherent in the certificates of designation

governing the other series of the Companies' preferred stock was an implied covenant by Fannie

Mae and Freddie Mac to deal fairly with the holders of preferred stock and to fulfill the issuers'

contractual obligations and the stockholders' reasonable contractual expectations in good faith,

*e.g.*, an implied promise that the Companies would not take actions that would make it

impossible for the holders of the preferred stock to realize any value from their dividend and

liquidation rights.  FHFA, acting in its purported capacity as conservator of the Companies, acted

unfairly and in bad faith with respect to the holders of the Companies' preferred stock and

breached the Companies' implied covenant of good faith and fair dealing by agreeing to the Net

Worth Sweep, the purpose and effect of which was to make it impossible for the holders of the

Companies' preferred stock to realize any value from their dividend and liquidation rights, and

thus to deny the holders of the Companies' preferred stock the fruits of their agreements with

Fannie Mae and Freddie Mac.

**E.  BY ENTERING INTO THE NET WORTH SWEEP, FHFA AND TREASURY
    VIOLATED THEIR FIDUCIARY DUTIES TO THE COMPANIES AND THE
    CLASSES**

62.    Federal law obligates each Company to designate a body of law elected for its

corporate governance practices and procedures, to the extent not inconsistent with its federal

charter and other federal law, rules, and regulations.  Fannie Mae designated Delaware corporate law and Freddie Mac designated the corporate law of the Commonwealth of Virginia.  Pursuant to federal law incorporating Delaware corporate law, Fannie Mae's officers and directors owe fiduciary duties of due care and loyalty to Fannie Mae and Fannie Mae's stockholders, and a controlling stockholder of Fannie Mae owes fiduciary duties of due care and loyalty to Fannie Mae and Fannie Mae's other stockholders.  Similarly, pursuant to federal law incorporating Virginia law, Freddie Mac's officers and directors owe fiduciary duties of due care and loyalty to Freddie Mac and Freddie Mac's stockholders, and a controlling stockholder of Freddie Mac owes fiduciary duties of due care and loyalty to Freddie Mac and Freddie Mac's other stockholders.

63.     By reason of its purported conservatorship of the Companies and because of its ability to control the business and corporate affairs of the Companies, FHFA owes the Companies and their stockholders fiduciary obligations of due care and loyalty, and was and is required to use its utmost ability to control and manage the Companies in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of the Companies and their stockholders so as to benefit all stockholders equally and not in furtherance of the personal interest or benefit of FHFA or any individual class of stockholders, including Treasury and the federal government.  Because of its position of control and authority as the purported conservator of the Companies, FHFA was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.     Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and

Treasury's influence over FHFA officials, many of whom were employees of Treasury. With such de facto power over the Companies' financial condition and operations, Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders. As controlling stockholder of the Companies, Treasury owes fiduciary duties of due care and loyalty to the Companies and their other stockholders. In addition, because of Treasury's de facto position of control and authority over the Companies, it stood on both sides of the decision to engage in the Net Worth Sweep and it was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.     The Net Worth Sweep offered no benefits whatsoever to the Companies or their stockholders (other than Treasury). Rather, it was an egregiously unfair, self-dealing transaction, the benefits of which flowed entirely to Treasury as the Companies' controlling stockholder, and indirectly to FHFA through its status as a sister agency of the federal government.

66.     The Net Worth Sweep was contrary to the best interests of the Companies and their stockholders. Indeed, it was specifically intended to ensure that the Companies' stockholders (other than Treasury) could never again recover any value from their investments, and to ensure that the Companies could not function as private enterprises and would have to be wound down. By preventing the Companies from rebuilding capital or returning to the market, as Treasury stated in its press release, the purpose and effects of the Net Worth Sweep ran directly contrary to FHFA's purported statutory mission to "put the regulated entity in a sound and solvent condition," "carry on the business of the regulated entity," and "preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). As such, the Net Worth Sweep was inconsistent with and in manifest conflict with FHFA's statutory functions and responsibilities as conservator of the Companies.

67.     Further, because Treasury, as controlling stockholder of the Companies, stood on both sides of the transaction, the Net Worth Sweep was self-dealing in nature and the result of a manifest conflict of interest.

## CLASS ACTION ALLEGATIONS

68.     With respect to Counts 1, 3, 5 and 7 hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of any series of Fannie Mae preferred stock and who were damaged thereby (the "Fannie Preferred Class").  Excluded from the Fannie Preferred Class are the Defendants.

69.     With respect to Counts 2, 4, 6 and 8 hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of any series of Freddie Mac preferred stock and who were damaged thereby (the "Freddie Preferred Class"). Excluded from the Freddie Preferred Class are the Defendants.

70.     With respect to Counts 1 and 7 hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of Fannie Mae common stock and who were damaged thereby (the "Fannie Common Class," and, together with the Fannie Preferred Class, the "Fannie Classes").  Excluded from the Fannie Common Class are the Defendants.

71.     With respect to Counts 2 and 8 hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of Freddie Mac common

27

stock and who were damaged thereby (the "Freddie Common Class," and, together with the Freddie Preferred Class, the "Freddie Classes"). Excluded from the Freddie Common Class are the Defendants.

72.    The Fannie Preferred Class, Freddie Preferred Class, Fannie Common Class and Freddie Common Class are referred to herein collectively as the "Classes."

73.    The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Classes. As of August 17, 2012, and the date of the filing of this action, there were hundreds of millions of shares of Fannie Mae and Freddie Mac preferred and common stock outstanding. Record owners and other members of the Classes may be identified from records maintained by the Companies and/or their transfer agent(s) and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.    Plaintiffs' claims are typical of the claims of the other members of the Classes as all members of the Classes held Fannie Mae and/or Freddie Mac common and/or preferred stock and were similarly affected by Defendants' wrongful conduct that is complained of herein.

75.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action, derivative and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Classes.

76.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it

impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

77.     Common questions of law and fact exist as to all members of the Classes, and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

a)  Whether the Net Worth Sweep is void and unenforceable as a matter of Delaware and/or Virginia law;

b)  Whether FHFA, acting in its purported capacity as conservator of the Companies, breached the terms of the certificates of designation governing the Companies' preferred stock;

c)  Whether FHFA, acting in its purported capacity as conservator of the Companies, breached the implied covenant of good faith and fair dealing inherent in the certificates of designation governing the Companies' preferred stock;

d)  Whether FHFA and/or Treasury breached its fiduciary duties to the Companies and/or the members of the Classes; and

e)  Whether the members of the Classes are entitled to equitable relief, including rescission of the Net Worth Sweep, and/or whether one or more Defendants are liable for damages to the members of the Classes, and the proper measure thereof.

78.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

79.     Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.    With respect to Counts 1 and 9 hereof, Plaintiff Jacobs brings this action derivatively on behalf of and for the benefit of Fannie Mae to redress injuries suffered by Fannie Mae as a direct and proximate result of the wrongdoing alleged herein.  With respect to Counts 2 and 10 hereof, Plaintiff Jacobs brings this action derivatively on behalf of and for the benefit of Freddie Mac to redress injuries suffered by Freddie Mac as a direct and proximate result of the wrongdoing alleged herein.  This action is not a collusive one to confer jurisdiction that the court would otherwise lack.

81.    Plaintiff Jacobs is a holder of Fannie Mae and Freddie Mac preferred stock, was a holder of Fannie Mae and Freddie Mac preferred stock prior to and on August 17, 2012, and has been a holder of Fannie Mae and Freddie Mac preferred stock continuously since then.

82.    Plaintiff intends to retain his shares of the Companies' stock throughout the duration of this litigation.

83.    Plaintiff has retained counsel that is competent and experienced in class action, derivative and securities litigation.

84.    Plaintiff will adequately and fairly represent the interests of the Companies and their stockholders in enforcing and prosecuting their rights.

85.    The wrongdoing and violations of law complained of herein subject, and will persist in subjecting, the Companies to continuing irreparable harm because the adverse consequences of the injurious actions are still in effect and ongoing.

86.    To the extent any demand requirement with respect to FHFA would otherwise be applicable in this context, such demand is excused and Plaintiff is entitled to pursue the

derivative claims alleged herein as a result of FHFA's manifest conflict of interest and because FHFA faces a substantial threat of liability.

87.     Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and Treasury's influence over FHFA officials, many of whom were employees of Treasury.  With such de facto power over the Companies' financial condition and operations, Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.

88.     FHFA is interested in and benefits from the Net Worth Sweep as an agency of the federal government, and cannot reasonably be expected to initiate litigation seeking a declaration that the Net Worth Sweep is invalid, rescission of the Net Worth Sweep, and damages resulting from the Net Worth Sweep.  Indeed, Treasury and FHFA, as arms of the federal government, have manifest conflicts of interest with respect to the claims asserted herein.  Treasury and FHFA also face substantial threats of liability with respect to the claims asserted herein.

89.     Notwithstanding its fiduciary duties to Fannie Mae and its stockholders, FHFA has expressly acknowledged that it does not act with the interests of Fannie Mae stockholders in mind.  Indeed, Fannie Mae's 2008 Form 10-K filing frankly disclosed that, since the imposition of the conservatorship, the Company was "[n]o longer managed with a strategy to maximize common shareholder returns."  FHFA has made substantially similar statements with respect to Freddie Mac, disclosing in the Company's 2008 Form 10-K that, during the conservatorship, the Company was "[n]o longer managed with a strategy to maximize common stockholder returns."

90. Accordingly, FHFA is incapable of pursing the derivative claims for the wrongdoing alleged herein.

## CAUSES OF ACTION

### COUNT I
**Fannie Mae and Fannie Classes**
**Direct and Derivative Claims for Declaratory, Equitable and Compensatory Relief**
**The Net Worth Sweep Is Void and Unenforceable Because**
**Such a Term is Not Permitted by Delaware Law Applicable to Preferred Stock**

91. Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

92. Pursuant to its enabling legislation, applicable federal law, and Section 1.05 of its bylaws, Fannie Mae has designated that the DGCL controls for purposes of its corporate governance practices and procedures.

93. Under Delaware law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity. The Net Worth Sweep therefore is an illegal term for any preferred stock instrument, whether or not held by the federal government.

94. Section 151 of the DGCL allows preferred stockholders to receive dividends "*at such rates*, on such conditions and at such times as shall be stated in the certificate of incorporation or in the [board] resolution . . . ." 8 *Del. C.* § 151(c) (emphasis added). Preferred stock dividends must be made "payable *in preference to, or in . . . relation to*, the dividends payable on any other class or classes or of any other series of stock[.]" *Id.* (emphasis added). Section 151 does not permit a provision requiring that a series of preferred stock receive a quarterly dividend equal to the entire net worth of a corporation to the necessary exclusion (in perpetuity) of any dividends ever being paid on junior stock. In fact, Section 151(c) specifically

contemplates that, after payment of preferential dividends on senior preferred stock, "a dividend on the remaining class or classes or series of stock may then be paid out of the remaining assets of the corporation available for dividends . . . ." *Id.*

95.     Because the Net Worth Sweep diverts, in perpetuity, all of the net worth of Fannie Mae to Treasury, it neither is paid at a "rate" nor is it payable "in preference to" or "in relation to" the dividends payable to other classes or series of stock.  The Net Worth Sweep is not paid at a "rate" because Treasury's participation in corporate earnings growth is unlimited, absolute, and perpetual.  The Net Worth Sweep is not payable "in preference to" or "in relation to" the dividends payable to other classes or series of stock because it is payable to the absolute, permanent exclusion of dividends to other stockholders.  Once the Net Worth Sweep is paid each quarter, there necessarily will be no assets remaining in the Company that would ever be available for the payment of dividends on any other classes or series of stock regardless of how valuable the Company may become in the future.  Accordingly, the Net Worth Sweep is invalid under Section 151(c) of the DGCL and is void *ab initio* and unenforceable.

96.     Pursuant to 28 U.S.C. §§ 2201-2202, Plaintiffs request that the Court enter an Order declaring that the Net Worth Sweep is void and unenforceable under Delaware law.

97.     As a direct and proximate result of the wrongful implementation of the Net Worth Sweep, Fannie Mae and its stockholders, including Plaintiffs and the Fannie Classes, have suffered damages.

98.     Fannie Mae, Plaintiffs and the Fannie Classes have no adequate remedy at law.

**COUNT II**
**Freddie Mac and Freddie Classes**
**Direct and Derivative Claims for Declaratory, Equitable and Compensatory Relief**
**The Net Worth Sweep Is Void and Unenforceable Because**
**Such a Term is Not Permitted by Virginia Law Applicable to Preferred Stock**

99.     Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

100.     Pursuant to its enabling legislation and Section 11.3 of its bylaws, Freddie Mac has designated that the VSCA controls for purposes of its corporate governance practices and procedures.

101.     Under Virginia law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity.  The Net Worth Sweep therefore is an illegal term for any preferred stock instrument, whether or not held by the federal government.

102.     The VSCA provides that a corporation may authorize "one or more classes or series of shares that . . . *have preference over* any other class or series of shares with respect to distributions [such as dividends]."  Va. Code § 13.1-638 (emphasis added).  While there is no question that the VSCA permits corporations to establish a dividend "preference" that operates as a priority, it does not permit corporations to establish a dividend preference that operates to preclude all other classes of stockholders from the potential to receive dividends in perpetuity.

103.     Accordingly, the Net Worth Sweep is invalid under the VSCA and is void *ab initio* and unenforceable.

104.     Pursuant to 28 U.S.C. §§ 2201-2202, Plaintiffs request that the Court enter an Order declaring that the Net Worth Sweep is void and unenforceable under Virginia law.

105.    As a direct and proximate result of the wrongful implementation of the Net Worth Sweep, Freddie Mac and its stockholders, including Plaintiffs and the Freddie Classes, have suffered damages.

106.    Freddie Mac, Plaintiffs and the Freddie Classes have no adequate remedy at law.

**COUNT III**
**BREACH OF CONTRACT – FANNIE MAE PREFERRED STOCK**
**Fannie Preferred Class Against FHFA**

107.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

108.    As alleged in Count I, the Net Worth Sweep violates the DGCL, which for all purposes relevant hereto, is a contract between the members of the Fannie Preferred Class and Fannie Mae.

109.    The certificates of designation for the Fannie Mae preferred stock were and are, for all purposes relevant hereto, contracts between the members of the Fannie Preferred Class and Fannie Mae.

110.    The certificates of designation for the Fannie Mae preferred stock provide for contractually specified dividend rights, liquidation preferences, and voting and consent rights with respect to amendments to the terms of the preferred stock.

111.    Preferred stockholders—*i.e.*, Plaintiffs and the members of the Fannie Preferred Class—have certain contractual rights. Preferred stockholders are entitled to a contractually specified, non-cumulative dividend and to a contractually specified liquidation preference.  The dividend and liquidation rights of private preferred stockholders are prior to those of common stockholders.  Fannie Mae may not pay dividends or make distributions on account of its common stock in any quarter where dividends on preferred stock are not paid in full.

35

112.    By entering into the Net Worth Sweep, FHFA, as conservator for Fannie Mae, breached Fannie Mae's obligations to Plaintiffs and the members of the Fannie Preferred Class by nullifying entirely their contractual rights as holders of the Company's preferred stock.  As FHFA stated in its 2012 report to Congress, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital."  Thus, FHFA's agreement to the Net Worth Sweep and statements indicating that all future Company earnings are to be used to benefit taxpayers breached or repudiated Fannie Mae's contracts with Plaintiffs and the members of the Class.

113.    The Net Worth Sweep replaced the 10% dividend (if paid in cash) on Treasury's Senior Preferred Stock with a perpetual requirement that Fannie Mae pay its entire net worth to Treasury on a quarterly basis.  Amounts in excess of the 10% cash dividend on the Senior Preferred Stock would otherwise have been available to pay dividends to private stockholders. The Net Worth Sweep thus strips the Company of its ability to generate and retain funds to distribute as dividends to holders of preferred stock.

114.    By essentially expropriating the entirety of the Company's net worth for the government, the Net Worth Sweep also nullified entirely the contractual right of Plaintiffs and the members of the Class to receive a payment upon the dissolution, liquidation, or winding up of Fannie Mae.

115.    In short, the Net Worth Sweep effectively eliminated all of the economic rights of the Company's preferred stock other than Treasury's Senior Preferred Stock.

116.    Fannie Mae—and thus FHFA when acting as conservator for the Company—is contractually prohibited from unilaterally changing the terms of preferred stock to materially and adversely affect the rights of preferred stockholders.  The Net Worth Sweep violates this

prohibition by effectively eliminating the dividend and liquidation preference rights associated with the Company's preferred stock.

117.    No provision of preferred stockholders' contracts with the Company reserves to Fannie Mae any right to *repudiate* **or** *nullify entirely* the Company's contractual obligations to Plaintiffs and the members of the Class by granting rights to another class or series of the Company's stock.

118.    FHFA has therefore breached the Company's contracts with Plaintiffs and the members of the Class.

119.    Plaintiffs and the other members of the Fannie Preferred Class suffered damages as a direct and proximate result of the forgoing breach of contract.

**COUNT IV**
**BREACH OF CONTRACT – FREDDIE MAC PREFERRED STOCK**
**Freddie Preferred Class Against FHFA**

120.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

121.    As alleged in Count II, the Net Worth Sweep violates the VSCA, which for all purposes relevant hereto, is a contract between the members of the Freddie Preferred Class and Freddie Mac.

122.    The certificates of designation for the Freddie Mac preferred stock were and are, for all purposes relevant hereto, contracts between the members of the Freddie Preferred Class and Freddie Mac.

123.    The certificates of designation for the Freddie Mac preferred stock provide for contractually specified dividend rights, liquidation preferences, and voting and consent rights with respect to amendments to the terms of the preferred stock.

124.   Preferred stockholders—*i.e.*, Plaintiffs and the members of the Freddie Preferred Class—have certain contractual rights. Preferred stockholders are entitled to a contractually specified, non-cumulative dividend and to a contractually specified liquidation preference. The dividend and liquidation rights of private preferred stockholders are prior to those of common stockholders. Freddie Mac may not pay dividends or make distributions on account of its common stock in any quarter where dividends on preferred stock are not paid in full.

125.   By entering into the Net Worth Sweep, FHFA, as conservator for Freddie Mac, breached Freddie Mac's obligations to Plaintiffs and the members of the Freddie Preferred Class by nullifying entirely their contractual rights as holders of the Company's preferred stock. As FHFA stated in its 2012 report to Congress, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." Thus, FHFA's agreement to the Net Worth Sweep and statements indicating that all future Company earnings are to be used to benefit taxpayers breached or repudiated Freddie Mac's contracts with Plaintiffs and the members of the Class.

126.   The Net Worth Sweep replaced the 10% dividend (if paid in cash) on Treasury's Senior Preferred Stock with a perpetual requirement that Freddie Mac pay its entire net worth to Treasury on a quarterly basis. Amounts in excess of the 10% cash dividend on the Senior Preferred Stock would otherwise have been available to pay dividends to private stockholders. The Net Worth Sweep thus strips the Company of its ability to generate and retain funds to distribute as dividends to holders of preferred stock.

127.   By essentially expropriating the entirety of the Company's net worth for the government, the Net Worth Sweep also nullified entirely the contractual right of Plaintiffs and

the members of the Class to receive a payment upon the dissolution, liquidation, or winding up of Freddie Mac.

128.    In short, the Net Worth Sweep effectively eliminated all of the economic rights of the Company's preferred stock other than Treasury's Senior Preferred Stock.

129.    Freddie Mac—and thus FHFA when acting as conservator for the Company—is contractually prohibited from unilaterally changing the terms of preferred stock to materially and adversely affect the rights of preferred stockholders.  The Net Worth Sweep violates this prohibition by effectively eliminating the dividend and liquidation preference rights associated with the Company's preferred stock.

130.    No provision of preferred stockholders' contracts with the Company reserves to Freddie Mac any right to *repudiate* **or** *nullify entirely* the Company's contractual obligations to Plaintiffs and the members of the Class by granting rights to another class or series of the Company's stock.

131.    FHFA has therefore breached the Company's contracts with Plaintiffs and the members of the Class.

132.    Plaintiffs and the other members of the Freddie Preferred Class suffered damages as a direct and proximate result of the forgoing breach of contract.

**COUNT V**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**Fannie Preferred Class against FHFA**

133.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

134.    As alleged in Count I, the Net Worth Sweep violates the DGCL, which for all purposes relevant hereto, is a contract between the members of the Fannie Preferred Class and Fannie Mae.

135.    The certificates of designation for the Fannie Mae preferred stock were and are, for all purposes relevant hereto, contracts between the members of the Fannie Preferred Class and Fannie Mae.

136.    The certificates of designation for the Fannie Mae preferred stock provide for contractually specified dividend rights, liquidation preferences, and voting and consent rights with respect to amendments to the terms of the preferred stock.

137.    Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Fannie Mae to deal fairly with Plaintiffs and the other members of the Fannie Preferred Class, to fulfill their obligations to, and the reasonable contractual expectations of, Plaintiffs and the Fannie Preferred Class in good faith, and not to deprive Plaintiffs and the Fannie Preferred Class of the fruits of their bargain.

138.    As Fannie Mae's conservator, FHFA became obligated to act consistently with Fannie Mae's responsibilities under the certificates of designation governing its preferred stock.

139.    By entering into the Net Worth Sweep so as to effectively deprive Plaintiffs and the other members of the Fannie Preferred Class of any possibility of ever again receiving dividends or a liquidation preference, FHFA, acting in its purported capacity as conservator of Fannie Mae, breached the implied covenant of good faith and fair dealing inherent in the certificates of designation for the preferred stock.  Through the implied covenant of good faith and fair dealing, FHFA, acting in its purported capacity as conservator of Fannie Mae, was obligated not to eliminate the rights and interests of the Fannie Preferred Class with respect to

dividends and their liquidation preferences.  In effectively eliminating such rights and interests entirely through the Net Worth Sweep, FHFA, acting in its purported capacity as conservator of Fannie Mae, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Fannie Preferred Class.  FHFA, acting in its purported capacity as conservator of Fannie Mae, was motivated by an improper purpose reflecting bad faith when it agreed to and implemented the Net Worth Sweep, and it acted arbitrarily and unreasonably to deprive the members of the Fannie Preferred Class of their reasonable contractual expectations and the fruits of their agreement.

140.    Had the conduct engaged in by FHFA been contemplated at the time the certificates of designation were drafted, such conduct would have been prohibited.

141.    Plaintiffs and the other members of the Fannie Preferred Class suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing.

142.    Plaintiffs and the Fannie Preferred Class lack an adequate remedy at law.

## COUNT VI
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Freddie Preferred Class against FHFA

143.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

144.    As alleged in Count II, the Net Worth Sweep violates the VSCA, which for all purposes relevant hereto, is a contract between the members of the Freddie Preferred Class and Freddie Mac.

145.    The Certificates of Designation for the Freddie Mac preferred stock were and are, for all purposes relevant hereto, contracts between the members of the Freddie Preferred Class and Freddie Mac.

146.    The certificates of designation for the Freddie Mac preferred stock provide for contractually specified dividend rights, liquidation preferences, and voting and consent rights with respect to amendments to the terms of the preferred stock.

147.    Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Freddie Mac to deal fairly with Plaintiffs and the other members of the Freddie Preferred Class, to fulfill their obligations to, and the reasonable contractual expectations of, Plaintiffs and the Freddie Preferred Class in good faith, and not to deprive Plaintiffs and the Freddie Preferred Class of the fruits of their bargain.

148.    As Freddie Mac's conservator, FHFA became obligated to act consistently with Freddie Mac's responsibilities under the certificates of designation governing its preferred stock.

149.    By entering into the Net Worth Sweep so as to effectively deprive Plaintiffs and the other members of the Freddie Preferred Class of any possibility of ever again receiving dividends or a liquidation preference, FHFA, acting in its purported capacity as conservator of Freddie Mac, breached the implied covenant of good faith and fair dealing inherent in the certificates of designation for the preferred stock.  Through the implied covenant of good faith and fair dealing, FHFA, acting in its purported capacity as conservator of Freddie Mac, was obligated not to eliminate the rights and interests of the Freddie Preferred Class with respect to dividends and their liquidation preferences.  In effectively eliminating such rights and interests entirely through the Net Worth Sweep, FHFA, acting in its purported capacity as conservator of Freddie Mac, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward

the members of the Freddie Preferred Class.   FHFA, acting in its purported capacity as conservator of Freddie Mac, was motivated by an improper purpose reflecting bad faith when it agreed to and implemented the Net Worth Sweep, and it acted arbitrarily and unreasonably to deprive the members of the Freddie Preferred Class of their reasonable contractual expectations and the fruits of their agreement.

150.    Had the conduct engaged in by FHFA been contemplated at the time the certificates of designation were drafted, such conduct would have been prohibited.

151.    Plaintiffs and the other members of the Freddie Preferred Class suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing.

152.    Plaintiffs and the Freddie Preferred Class lack an adequate remedy at law.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**Fannie Classes Against FHFA and Treasury**

153.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

154.    Federal law obligates Fannie Mae to designate a body of law elected for its corporate governance practices and procedures, to the extent not inconsistent with its federal charter and other federal law, rules, and regulations, and Fannie Mae designated Delaware corporate law.   Pursuant to federal law incorporating Delaware corporate law, Fannie Mae's officers and directors owe fiduciary duties of due care and loyalty to Fannie Mae and its stockholders, and a controlling stockholder of Fannie Mae owes fiduciary duties of due care and loyalty to Fannie Mae and its other stockholders.

155.    By imposing a conservatorship over Fannie Mae, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care and loyalty to Fannie Mae's stockholders, including Plaintiffs and the other members of the Fannie Classes, and was and is required to use its utmost ability to control and manage Fannie Mae in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Fannie Mae stockholders so as to benefit all stockholders equally and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

156.    Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and Treasury's influence over FHFA officials, many of whom were employees of Treasury.  With such de facto power over the Companies' financial condition and operations, Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.  As controlling stockholder of Fannie Mae, Treasury owed fiduciary duties of due care and loyalty to Fannie Mae's other stockholders.  For the reasons described herein, Treasury has breached those fiduciary duties.

157.    The Net Worth Sweep constituted an unfair, self-dealing transaction with Fannie Mae's controlling stockholder.  Treasury, as controlling stockholder of Fannie Mae, stood on both sides of the decision to implement the Net Worth Sweep, to the benefit of Treasury and the detriment of Fannie Mae stockholders other than Treasury.  The Net Worth Sweep effected an improper transfer—an expropriation—of economic value from the Company's other

stockholders to Treasury.   Moreover, as an agency of the federal government, FHFA was interested in and benefited from the Net Worth Sweep, and therefore had a conflict of interest.

158.    Through the Net Worth Sweep, FHFA and Treasury violated Delaware law and applicable federal law by breaching their fiduciary duties to Fannie Mae's stockholders, including Plaintiff and the other members of the Fannie Classes.   The Net Worth Sweep transaction was not entirely fair to Plaintiffs and the other members of the Fannie Classes, as it was neither the product of a fair process nor did it reflect a fair price.   Indeed, Fannie Mae received ***no consideration whatsoever*** in exchange for the Net Worth Sweep.   The Net Worth Sweep, which effectively delivers all of Fannie Mae's profits and net worth to the Treasury in perpetuity, was granted to the benefit of Treasury and to the detriment of Plaintiffs and the other members of the Fannie Classes.

159.    As a direct and proximate result of the foregoing breaches of fiduciary duty, Fannie Mae stockholders, including Plaintiffs and the Fannie Classes, have suffered damages.

160.    Plaintiffs and the Fannie Classes lack an adequate remedy at law.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY
### Freddie Classes Against FHFA and Treasury

161.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

162.    Federal law obligates Freddie Mac to designate a body of law elected for its corporate governance practices and procedures, to the extent not inconsistent with its federal charter and other federal law, rules, and regulations, and Freddie Mac designated Virginia corporate law.   Pursuant to federal law incorporating Virginia corporate law, Freddie Mac's officers and directors owe fiduciary duties of due care and loyalty to Freddie Mac and its

stockholders, and a controlling stockholder of Freddie Mac owes fiduciary duties of due care and loyalty to Freddie Mac and its other stockholders.

163.    By imposing a conservatorship over Freddie Mac, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care and loyalty to Freddie Mac's stockholders, including Plaintiffs and the other members of the Freddie Classes, and was and is required to use its utmost ability to control and manage Freddie Mac in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Freddie Mac stockholders so as to benefit all stockholders equally and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

164.    Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and Treasury's influence over FHFA officials, many of whom were employees of Treasury.  With such de facto power over the Companies' financial condition and operations, Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.  As controlling stockholder of Freddie Mac, Treasury owed fiduciary duties of due care and loyalty to Freddie Mac's other stockholders.  For the reasons described herein, Treasury has breached those fiduciary duties.

165.    The Net Worth Sweep constituted an unfair, self-dealing transaction with Freddie Mac's controlling stockholder.  Treasury, as controlling stockholder of Freddie Mac, stood on both sides of the decision to implement the Net Worth Sweep, to the benefit of Treasury and the detriment of Freddie Mac stockholders other than Treasury.  The Net Worth Sweep effected an

improper transfer—an expropriation—of economic value from the Company's other stockholders to Treasury. Moreover, as an agency of the federal government, FHFA was interested in and benefited from the Net Worth Sweep, and therefore had a conflict of interest.

166.   Through the Net Worth Sweep, FHFA and Treasury violated Virginia law and applicable federal law by breaching their fiduciary duties to Freddie Mac's stockholders, including Plaintiffs and the other members of the Freddie Classes. The Net Worth Sweep transaction was not entirely fair to Plaintiffs and the other members of the Freddie Classes, as it was neither the product of a fair process nor did it reflect a fair price. Indeed, Freddie Mac received *no consideration whatsoever* in exchange for the Net Worth Sweep. The Net Worth Sweep, which effectively delivers all of Freddie Mac's profits and net worth to Treasury in perpetuity, was granted to the benefit of Treasury and to the detriment of Plaintiffs and the other members of the Freddie Classes.

167.   As a direct and proximate result of the foregoing breaches of fiduciary duty, Freddie Mac stockholders, including Plaintiffs and the Freddie Classes, have suffered damages.

168.   Plaintiffs and the Freddie Classes lack an adequate remedy at law.

## COUNT IX
## BREACH OF FIDUCIARY DUTY
**Plaintiff Jacobs, Derivatively on behalf of Fannie Mae, Against FHFA and Treasury**

169.   Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

170.   Federal law obligates Fannie Mae to designate a body of law elected for its corporate governance practices and procedures, to the extent not inconsistent with its federal charter and other federal law, rules, and regulations, and Fannie Mae designated Delaware corporate law. Pursuant to federal law incorporating Delaware corporate law, Fannie Mae's

officers and directors owe fiduciary duties of due care and loyalty to Fannie Mae and its stockholders, and a controlling stockholder of Fannie Mae owes fiduciary duties of due care and loyalty to Fannie Mae and its other stockholders.

171.    By imposing a conservatorship over Fannie Mae, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care and loyalty to Fannie Mae, and was and is required to use its utmost ability to control and manage Fannie Mae in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Fannie Mae and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

172.    Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and Treasury's influence over FHFA officials, many of whom were employees of Treasury.  With such de facto power over the Companies' financial condition and operations, Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.  As controlling stockholder of Fannie Mae, Treasury owed fiduciary duties of due care and loyalty to Fannie Mae.  For the reasons described herein, Treasury has breached those fiduciary duties.

173.    The Net Worth Sweep constituted an unfair, self-dealing transaction with Fannie Mae's controlling stockholder.  Treasury, as controlling stockholder of the Company, stood on both sides of the decision to implement the Net Worth Sweep, to the benefit of Treasury and the detriment of Fannie Mae.   The Net Worth Sweep effected an improper transfer—an

expropriation—of economic value from the Company to Treasury.  Indeed, the Company received ***no consideration whatsoever*** in exchange for the Net Worth Sweep.  Moreover, as an agency of the federal government, FHFA was interested in and benefited from the Net Worth Sweep, and therefore had a conflict of interest.

174.    Through the Net Worth Sweep, FHFA and Treasury violated Delaware law and applicable federal law by breaching their fiduciary duties to Fannie Mae.  The Net Worth Sweep transaction was not entirely fair to Fannie Mae, as it was neither the product of a fair process nor did it reflect a fair price.  Indeed, the Net Worth Sweep, which effectively delivers all of Fannie Mae's profits and net worth to Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Fannie Mae in return.

175.    The Net Worth Sweep was neither entirely nor intrinsically fair to Fannie Mae, nor did it further any valid business purpose of Fannie Mae, nor did it reflect a good faith business judgment as to what was in the best interests of Fannie Mae.

176.    Because Fannie Mae received ***no consideration whatsoever*** in exchange for agreeing to the Net Worth Sweep, FHFA authorized an exchange that was so one-sided that no business person of ordinary, sound judgment could conclude that Fannie Mae received adequate consideration.

177.    The Net Worth Sweep constituted waste, a gross abuse of discretion, and bad faith.

178.    As a direct and proximate result of the foregoing breaches of fiduciary duty, Fannie Mae has suffered damages.

179.    Fannie Mae lacks an adequate remedy at law.

**COUNT X**
**BREACH OF FIDUCIARY DUTY**
**Plaintiff Jacobs, Derivatively on behalf of Freddie Mac, Against FHFA and Treasury**

180.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

181.    Federal law obligates Freddie Mac to designate a body of law elected for its corporate governance practices and procedures, to the extent not inconsistent with its federal charter and other federal law, rules, and regulations, and Freddie Mac designated Virginia corporate law.  Pursuant to federal law incorporating Virginia corporate law, Freddie Mac's officers and directors owe fiduciary duties of due care and loyalty to Freddie Mac and its stockholders, and a controlling stockholder of Freddie Mac owes fiduciary duties of due care and loyalty to Freddie Mac and its other stockholders.

182.    By imposing a conservatorship over Freddie Mac, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care and loyalty to Freddie Mac, and was and is required to use its utmost ability to control and manage Freddie Mac in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Freddie Mac and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

183.    Treasury as an investor exercises de facto control over the Companies, including through its Senior Preferred Stock and warrants to purchase the Companies' common stock, as well as Treasury's control of the provision of funds to the Companies, Treasury's consent rights over the Companies repaying the Senior Preferred Stock or exiting conservatorship, and Treasury's influence over FHFA officials, many of whom were employees of Treasury.  With such de facto power over the Companies' financial condition and operations, Treasury is in a

position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.  As controlling stockholder of Freddie Mac, Treasury owed fiduciary duties of due care and loyalty to Freddie Mac.  For the reasons described herein, Treasury has breached those fiduciary duties.

184.    The Net Worth Sweep constituted an unfair, self-dealing transaction with Freddie Mac's controlling stockholder.  Treasury, as controlling stockholder of Freddie Mac, stood on both sides of the decision to implement the Net Worth Sweep, to the benefit of Treasury and the detriment of Freddie Mac.  The Net Worth Sweep effected an improper transfer—an expropriation—of economic value from the Company to Treasury.  Indeed, the Company received ***no consideration whatsoever*** in exchange for the Net Worth Sweep.  Moreover, as an agency of the federal government, FHFA was interested in and benefited from the Net Worth Sweep, and therefore had a conflict of interest.

185.    Through the Net Worth Sweep, FHFA and Treasury violated Virginia law and applicable federal law by breaching their fiduciary duties to Freddie Mac.  The Net Worth Sweep transaction was not entirely fair to Freddie Mac, as it was neither the product of a fair process nor did it reflect a fair price.  Indeed, the Net Worth Sweep, which effectively delivers all of Freddie Mac's profits and net worth to Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Fannie Mae in return.

186.    The Net Worth Sweep was neither entirely nor intrinsically fair to Freddie Mac, nor did it further any valid business purpose of Freddie Mac, nor did it reflect a good faith business judgment as to what was in the best interests of Freddie Mac.

187.    Because Freddie Mac received ***no consideration whatsoever*** in exchange for agreeing to the Net Worth Sweep, FHFA authorized an exchange that was so one-sided that

no business person of ordinary, sound judgment could conclude that Freddie Mac received adequate consideration.

188.     The Net Worth Sweep constituted waste, a gross abuse of discretion, and bad faith.

189.     As a direct and proximate result of the foregoing breaches of fiduciary duty, Freddie Mac has suffered damages.

190.     Freddie Mac lacks an adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Classes defined herein;

B.     Determining that Plaintiff Jacobs may maintain this action on behalf of Fannie Mae and Freddie Mac and that Plaintiff Jacobs is an adequate representative of Fannie Mae and Freddie Mac, and that this action is a proper derivative action maintainable under law and that, to the extent any demand requirement may otherwise apply, such demand is excused;

C.     Granting appropriate equitable and injunctive relief to remedy Defendants' wrongdoing, including rescission of the Net Worth Sweep and restitution of the monies paid by the Companies to Treasury pursuant thereto;

D.     Declaring that the Net Worth Sweep is void and unenforceable as a matter of Delaware and Virginia law;

E.     Declaring that FHFA breached the terms of the Certificates of Designation governing the Companies' preferred stock;

F.      Declaring that FHFA breached the implied covenant of good faith and fair dealing inherent in the Certificates of Designation governing the Companies' preferred stock;

G.      Awarding compensatory damages in favor of Plaintiffs and the Classes and against FHFA as a result of such Defendant's breaches of the Certificates of Designation and the implied covenant of good faith and fair dealing, in an amount to be proven at trial, including interest thereon;

H.      Declaring that Defendants FHFA and Treasury breached their fiduciary duties to the Companies and their stockholders, including Plaintiffs and the Classes;

I.      Awarding compensatory damages, restitution, and/or disgorgement in favor of the Companies and against Defendants FHFA and Treasury, jointly and severally, as a result of such Defendants' breaches of fiduciary duty, in an amount to be proven at trial, including interest thereon;

J.      Awarding compensatory damages, restitution, and/or disgorgement in favor of Plaintiffs and the Classes and against Defendants FHFA and Treasury, jointly and severally, as a result of such Defendants' breaches of fiduciary duty, in an amount to be proven at trial, including interest thereon;

K.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

L.      Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

POTTER ANDERSON & CORROON LLP


By:   _/s/ Myron T. Steele_
      Myron T. Steele (DE Bar No. 2)
      Michael A. Pittenger (DE Bar No. 3212)
      Christopher N. Kelly (DE Bar No. 5717)
      Hercules Plaza
      1313 North Market Street, 6th Floor
      Wilmington, DE 19801
      (302) 984-6000
      msteele@potteranderson.com
      mpittenger@potteranderson.com
      ckelly@potteranderson.com

      *Attorneys for Plaintiffs*

Dated:  August 17, 2015

1198409

## VERIFICATION

I, David Jacobs, hereby verify that I have authorized the filing of the attached Class Action and Derivative Complaint (the "Complaint"), that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _August 17th, 2015_           _David Jacobs_
                                         David Jacobs

## <u>VERIFICATION</u>

I, Gary Hindes, hereby verify that I have authorized the filing of the attached Class Action and Derivative Complaint (the "Complaint"), that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.


DATE:  August 16, 2015



Gary E. Hindes