**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DAVID JACOBS and GARY HINDES, on behalf of themselves and all others similarly situated, and derivatively on behalf of the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 15-708 |
| THE FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, and THE UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| THE FEDERAL NATIONAL MORTGAGE ASSOCIATION and THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | ) ) ) ) | |
| Nominal Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED**
**COMPLAINT BY DEFENDANTS FHFA, FANNIE MAE, AND FREDDIE MAC**

Robert J. Stearn, Jr. (No. 2915)
Robert C. Maddox (No. 5356)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
stearn@rlf.com
maddox@rlf.com

*Attorneys for Defendants Federal Housing
Finance Agency, Federal National Mortgage
Association, and Federal Home Loan
Mortgage Corporation*

Howard N. Cayne (admitted *pro hac vice*)
Asim Varma (admitted *pro hac vice*)
David B. Bergman (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue
Washington, DC 20001
(202) 942-5000
Howard.Cayne@apks.com
Asim.Varma@apks.com
David.Bergman@apks.com

*Attorneys for Defendant Federal Housing
Finance Agency*

Michael Joseph Ciatti
(admitted *pro hac vice*)
Graciela Maria Rodriguez
(admitted *pro hac vice*)
King & Spalding LLP
1700 Pennsylvania Avenue N.W.
Washington, DC 20006
(202) 626-5508
(202) 626-3737
mciatti@kslaw.com
gmrodriguez@kslaw.com

*Attorneys for Defendant Federal Home Loan
Mortgage Corporation*

Jeffrey W. Kilduff
Michael Walsh
O'Melveny & Meyers LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
jkilduff@omm.com
mwalsh@omm.com

*Attorneys for Defendant Federal National
Mortgage Association*

Dated:  April 17, 2017

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................................2

STATEMENT OF FACTS .........................................................................................................5

I.      Fannie Mae, Freddie Mac, and the Appointment of FHFA as Conservator .....................5

II.     The PSPAs Between Treasury and the Enterprises ...........................................................7

III.    The Third Amendment to the PSPAs...................................................................................8

STANDARD OF REVIEW ........................................................................................................9

ARGUMENT .............................................................................................................................10

I.      Section 4617(f) Bars Plaintiffs' Claims Seeking Equitable and Declaratory
        Relief...................................................................................................................................10

        A.      The Third Amendment Was an Exercise of the Conservator's Broad
                Statutory Powers .....................................................................................................13

        B.      Section 4617(f) Applies Notwithstanding Plaintiffs' Allegation that the
                Third Amendment Violates State Law ....................................................................16

        C.      Section 4617(f) Applies Notwithstanding Plaintiffs' Allegations that the
                Conservator Did a Bad Job or Acted With an Improper Motive ............................18

II.     HERA Bars Shareholder Claims During Conservatorship .................................................20

        A.      The Conservator Succeeds, at a Minimum, to Shareholders' Ability to
                Pursue Derivative Claims During Conservatorship.................................................20

        B.      Plaintiffs' Claims Are Derivative, Not Direct ........................................................21

        C.      There Is No "Conflict of Interest" Exception to HERA .........................................22

III.    Plaintiffs' Claims are Barred by the Doctrine of Issue Preclusion ....................................24

IV.     Counts I and II Fail to State a Claim That the Treasury Stock Certificates, As
        Amended by the Third Amendment, Violate Delaware or Virginia Statutes ....................24

        A.      Federal Law, Not State Law, Governs the Conservator's Ability to
                Agree to the Third Amendment and the Resulting Treasury Stock
                Certificates ..............................................................................................................25

B.    The Third Amendment Complies With the Delaware and Virginia
Statutes Upon Which Plaintiffs Rely ....................................................................28

CONCLUSION.............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allis–Chalmers Corp. v. Lueck*,
  471 U.S. 202 (1985)..........................................................................................................27

*Bank of Am. Nat'l Ass'n v. Colonial Bank*,
  604 F.3d 1239 (11th Cir. 2010) ......................................................................................12

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
  517 U.S. 25 (1996)............................................................................................................27

*Cont'l W. Ins. Co. v. FHFA*,
  83 F. Supp. 3d 828 (S.D. Iowa 2015) ...............................................................2, 15, 19, 21

*Courtney v. Halleran*,
  485 F.3d 942, 949 (7th Cir. 2007) ..................................................................................15

*Cty. of Sonoma v. FHFA*,
  710 F.3d 987 (9th Cir. 2013) ................................................................................10, 12, 19

*Davis v. Devine*,
  736 F.2d 1108 (6th Cir. 1984) .........................................................................................16

*Delaware Cty., Pa. v. FHFA*,
  747 F.3d 215 (3d Cir. 2014)............................................................................................22

*Delta Savs. Bank v. United States*,
  265 F.3d 1017 (9th Cir. 2001) .....................................................................................23, 24

*DiFelice v. Aetna U.S. Healthcare*,
  346 F.3d 442 (3d Cir. 2003)...............................................................................................7

*Dittmer Props., L.P. v. F.D.I.C.*,
  708 F.3d 1011 (8th Cir. 2013) .........................................................................................12

*Edwards v. Deloitte & Touche, LLP*,
  No. 16-21221-CIV, 2017 WL 1291994 (S.D. Fla. Jan. 18, 2017)...........................................22

*El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*,
  152 A.3d 1248 (Del. 2016) ................................................................................................4

*Elliott Assocs., L.P. v. Avatex Corp.*,
  715 A.2d 843 (Del. 1998) ................................................................................................29

*Esther Sadowsky Testamentary Trust v. Syron*,
    639 F. Supp. 2d 347 (S.D.N.Y. 2009)....................................................................20

*Fasano v. Fed. Reserve Bank of N.Y.*,
    457 F.3d 274 (3d Cir. 2006).................................................................................27

*F.D.I.C. v. Bank of Boulder*,
    911 F.2d 1466 (10th Cir. 1990) ...........................................................................27

*FHFA v. City of Chicago*,
    962 F. Supp. 2d 1044 (N.D. Ill. 2013) .................................................................13

*First Hartford Corp. Pension Plan & Trust v. United States*,
    194 F.3d 1279 (Fed. Cir. 1999)........................................................................23, 24

*Freeman v. F.D.I.C.*,
    56 F.3d 1394 (D.C. Cir. 1995) .............................................................................11

*Furgatch v. Resolution Trust Corp.*,
    Civ. No. 93-20304 SW, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993) ...................12

*Gail C. Sweeney Estate Marital Trust v. U.S. Treasury Dep't*,
    68 F. Supp. 3d 116, 125-26 (D.D.C. 2014)......................................................11, 21

*Gosnell v. F.D.I.C.*,
    No. 90-1266L, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991)..................................14

*Gross v. Bell Sav. Bank PaSA*,
    974 F.2d 403 (3d Cir. 1992).............................................................12, 17, 18, 19

*Hindes v. F.D.I.C.*,
    137 F.3d 148 (3d Cir. 1998)................................................................................11

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
    643 F. Supp. 2d 790 (E.D. Va. 2009) ..................................................................21

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, ERISA Litig.*,
    629 F. Supp. 2d 1 (D.D.C. 2009) .........................................................................21

*In re Landmark Land Co. of Carolina*,
    No. 96-1404, 1997 WL 159479 (4th Cir. Apr. 7, 1997) ......................................17

*In re Landmark Land Co. of Okla., Inc.*,
    973 F.2d 283 (4th Cir. 1992) ..............................................................................13

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
    678 F.3d 235 (3d Cir. 2012)..............................................................................9, 10

*Kain v. Angle,*
    69 S.E. 355 (Va. 1910)...................................................................................29

*Kellmer v. Raines,*
    674 F.3d 848 (D.C. Cir. 2012) ..................................................................20, 21

*Kuriakose v. Fed. Home Loan Mortg. Corp.,*
    674 F. Supp. 2d 483 (S.D.N.Y. 2009) ...........................................................11

*Leon Cty. v. FHFA,*
    700 F.3d 1273 (11th Cir. 2012) .....................................................................11

*Massachusetts v. FHFA,*
    54 F. Supp. 3d 94, 101-02 (D. Mass. 2014)...................................................11

*MBIA Ins. Corp. v. F.D.I.C.,*
    708 F.3d 234 (D.C. Cir. 2013) .......................................................................13

*N. Haven Bd. of Educ. v. Bell,*
    456 U.S. 512 (1982).......................................................................................16

*Nat'l Trust for Historic Pres. in U.S. v. F.D.I.C.,*
    21 F.3d 469 (D.C. Cir. 1994) .........................................................................11

*Nat'l Trust for Historic Pres. v. F.D.I.C.,*
    995 F.2d 238 (D.C. Cir. 1993) ..................................................................17, 19

*Pagliara v. Fed. Home Loan Mortg. Corp.,*
    203 F. Supp. 3d 678, 689 (E.D. Va. 2016) .............................................20, 22, 23

*Perry Capital v. Mnuchin,*
    848 F. 3d 1072 (D.C. Cir. 2017) .................................................... *passim*

*Roberts v. FHFA,*
    --- F. Supp. 3d ----, 2017 WL 1049841 (N.D. Ill. Mar. 20, 2017)............2, 13, 15, 19

*Robinson v. FHFA,*
    --- F. Supp. 3d. ----, 2016 WL 4726555 (E.D. Ky. Sept. 9, 2016)................2, 10, 15

*Rosa v. Resolution Trust Corp.,*
    938 F.2d 383 (3d Cir. 1991)....................................................................16, 17, 18

*RPM Invs., Inc. v. Resolution Trust Corp.,*
    75 F.3d 618 (11th Cir. 1996) .........................................................................17

*Saxton v. FHFA,*
    --- F. Supp. 3d ----, 2017 WL 1148279 (N.D. Iowa Mar. 27, 2017) .................2, 15, 19, 22, 24

*Shintom Co., Ltd. v. Audiovox Corp.*,
    No. Civ. A. 693-N, 2005 WL 1138740 (Del. Ch. May 4, 2005) ............................................30

*Shintom Co. v. Audiovox Corp.*,
    888 A.2d 225 (Del. 2005) ..........................................................................................28, 29

*Surrick v. Killion*,
    449 F.3d 520 (3d Cir. 2006).....................................................................................27

*Town of Babylon v. FHFA*,
    699 F.3d 221 (2d Cir. 2012)...............................................................................11, 12

*United Liberty Life Ins. Co. v. Ryan*,
    985 F.2d 1320, 1323, 1328-29 (6th Cir. 1993) ...................................................15

*Volges v. Resolution Trust Corp.*,
    32 F.3d 50 (2d Cir. 1994) ..........................................................................15, 17, 18

*Ward v. Resolution Trust Corp.*,
    996 F.2d 99 (5th Cir. 1993) ...........................................................................12, 17

*Waterview Mgmt. Co. v. FDIC*,
    105 F.3d 696, 700-02 (D.C. Cir. 1997) ..............................................................15

**STATUTES**

12 U.S.C.
    § 1451 *et seq.* ...........................................................................................................25
    § 1452(b)(1) ............................................................................................................25
    § 1455(f) .................................................................................................................25
    § 1455(*l*)(1) ............................................................................................................6, 7
    § 1716 *et seq.* ..........................................................................................................25
    § 1718(a) ................................................................................................................25
    § 1718(c)(1) ............................................................................................................25
    § 1719(g)(1)(A) ........................................................................................................6
    § 1719(g)(1)(C) ......................................................................................................7, 8
    § 1821(d)(2)(G)(i) ..................................................................................................15
    § 1821(j).........................................................................................11, 16, 17, 18, 19
    § 4617(a)(2) ........................................................................................................5, 15
    § 4617(a)(4)(A) ........................................................................................................8
    § 4617(b)(2) ............................................................................................................14
    § 4617(b)(2)(A)........................................................................................4, 6, 20, 22, 23
    § 4617(b)(2)(B).................................................................................................6, 14, 15
    § 4617(b)(2)(D)(ii).................................................................................................15
    § 4617(b)(2)(G).................................................................................................6, 14
    § 4617(b)(2)(J)(ii)...........................................................................................6, 14, 21
    § 4617(f)........................................................................................................ *passim*

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 702, Tit. VII,
Div. O, 129 Stat. 2242 (2015) ................................................................................................16

8 Del. Code § 151(c) ..................................................................................................16, 28, 29, 30

Housing and Economic Recovery Act of 2008, Pub. L. 110-289, 122 Stat. 2654
(July 30, 2008), *codified at* 12 U.S.C. § 4511 *et seq* ..........................................................2, 5

Va. Code
    § 13.1-638 ..........................................................................................................................16, 29
    § 13.1-638(A) ............................................................................................................................28
    § 13.1-638(C) ............................................................................................................................29
    § 13.1-638(D) ............................................................................................................................30
    § 13.1-638(F) ............................................................................................................................28

## OTHER AUTHORITIES

12 C.F.R. § 1710.10 ....................................................................................................................25, 26

67 Fed. Reg. 38361 (Jun. 4, 2002) ...............................................................................................26

BLACK'S LAW DICTIONARY (9th ed. 2009) ...................................................................................7

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs David Jacobs and Gary Hindes commenced this action on August 17, 2015, by filing their putative Class Action and Derivative Complaint.  D.I. 1.  On November 13, 2015, Defendants filed two motions to dismiss—one by the Federal Housing Finance Agency ("FHFA" or the "Conservator"), Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Mortgage Association ("Freddie Mac") (D.I. 17), and one by the United States Department of the Treasury ("Treasury") (D.I. 19).

In March 2016, the Court stayed this case pending a ruling by the United States Judicial Panel on Multidistrict Litigation concerning related litigation.  D.I. 44.  The Court lifted the stay a few months later, in July.  D.I. 47.  The Court subsequently denied (D.I. 50) Plaintiffs' Application for Certification to the Delaware and Virginia Supreme Courts (D.I. 24) in September 2016.

In February 2017, the Court entered an order (D.I. 61) granting Plaintiffs' Motion for Leave to Amend (D.I. 48) and denying as moot Defendants' motions to dismiss the original complaint (D.I. 17; D.I. 19).  Plaintiffs filed their First Amended Complaint in March 2017 (D.I. 62), and the Court subsequently approved the parties' Stipulation to Modify Briefing Schedule and to Extend Page Limits for the motions to dismiss the amended complaint (D.I. 64).

All Defendants now move to dismiss the First Amended Complaint.  This is the opening brief of defendants FHFA, Fannie Mae, and Freddie Mac in support of their motion to dismiss. FHFA, Fannie Mae, and Freddie Mac also adopt and incorporate the arguments made by the Department of the Treasury in its opening brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This action is one in a series of suits brought by shareholders of Fannie Mae and Freddie Mac (together, the "Enterprises" or "GSEs"), all of which seek to challenge the so-called "Third Amendment" to the Senior Preferred Stock Purchase Agreements ("PSPAs") between Treasury and FHFA in its capacity as Conservator of the Enterprises.  To date, six federal courts have addressed claims that the Third Amendment is invalid and all six courts (including the D.C. Circuit) have dismissed those claims as barred by federal law—namely, the Housing and Economic Recovery Act of 2008 ("HERA").  Pub. L. No. 110-289, 122 Stat. 2654 (2008), codified at 12 U.S.C. § 4511 *et seq.*[1]  Here, Plaintiffs' First Amended Complaint ("FAC") alleges that the Third Amendment is invalid under the state laws of Delaware and Virginia because it purportedly fails to comply with certain alleged state statutory requirements pertaining to the issuance of preferred stock.  FAC ¶¶ 79-94.  On this basis, Plaintiffs ask the Court to declare the Third Amendment void and enter an order vacating it.  But the same dispositive provisions of federal law that required dismissal in each of the prior six suits apply equally here, notwithstanding the alleged violations of state law asserted by Plaintiffs.  Indeed, because Plaintiffs expressly plead each of their claims as derivative, certain of those prior decisions (also addressing derivative claims) have a binding, preclusive effect that bars Plaintiffs' attempt to re-litigate the same dispositive issues here.

Through this litigation, Plaintiffs ask the Court to re-write the PSPAs, which are the essential funding agreements between the Treasury and the Conservator.  Pursuant to the PSPAs,

---

[1]   *See Perry Capital v. Mnuchin*, 848 F. 3d 1072, 1080 (D.C. Cir. 2017) (affirming in pertinent part *Perry Capital v. Lew*, 70 F. Supp. 3d 208, 246 (D.D.C. 2014)); *Saxton v. FHFA*, --- F. Supp. 3d ----, 2017 WL 1148279, at *10 (N.D. Iowa Mar. 27, 2017); *Roberts v. FHFA*, --- F. Supp. 3d -- ---, 2017 WL 1049841, at *2 (N.D. Ill. Mar. 20, 2017); *Robinson v. FHFA*, --- F. Supp. 3d. ----, 2016 WL 4726555, at *5-8 (E.D. Ky. Sept. 9, 2016); *Cont'l W. Ins. Co. v. FHFA*, 83 F. Supp. 3d 828, 840 n.6 (S.D. Iowa 2015).

Treasury invested $189.5 billion into the Enterprises and remains contractually committed to invest up to $258.1 billion more, if necessary to prevent the mandatory placement of the Enterprises into statutory receivership and liquidation.  In return, Treasury received senior preferred stock in the Enterprises that featured (a) a liquidation preference that increased dollar-for-dollar with the amount that Treasury invested, (b) a fixed dividend based on the amount that Treasury invested, and (c) a periodic commitment fee based on the market value of the Treasury commitment.  The Third Amendment changed the dividend structure from a fixed dividend to a variable dividend based on the Enterprises' net worth, and relieved the Enterprises of their obligation to pay periodic commitment fees.  Here, Plaintiffs seek to maintain those aspects of the agreements they like—*i.e.*, the unprecedented, continuing, and massive financial support from Treasury—and discard the parts they do not like—*i.e.*, the variable dividend of the Third Amendment.  But HERA bars Plaintiffs' efforts to reward themselves at the expense of federal taxpayers, who risked—and continue to risk—hundreds of billions of dollars.

There are at least four independent bases for dismissal—each purely legal.

1.      The Court lacks jurisdiction over Plaintiffs' claims seeking equitable and declaratory relief—including rescission of the Third Amendment—because "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator."  12 U.S.C. § 4617(f).  Congress gave the Conservator broad statutory powers to operate the Enterprises and take actions on their behalf, all in a manner the Conservator alone determines is in the best interests of the Enterprises or FHFA.  Section 4617(f) of HERA, in turn, protects the Conservator's exercise of these powers by barring efforts—like Plaintiffs' here—to second-guess the Conservator's operational judgments through litigation.  Significantly, this bar on judicial review applies irrespective of alleged violations of state law.  So long as the

Conservator acted pursuant to its broad statutory powers—*e.g.*, by amending a funding agreement on behalf of the Enterprises—courts may not "restrain or affect" that action.

2.      HERA bars shareholder derivative claims while the Enterprises are in conservatorship.  HERA provides that FHFA, upon its appointment as Conservator, "immediately succeed[ed]" to "all rights" of the Enterprises *and* their shareholders.  12 U.S.C. § 4617(b)(2)(A).  This Succession Provision applies at least to all derivative claims that shareholders like Plaintiffs may seek to assert on behalf of the Enterprises.  Further, the Succession Provision contains no exception for purported "conflicts of interest," and every court to have addressed this issue under HERA has refused to judicially-enact such an exception.  That Plaintiffs attempt to label their claims "direct *and* derivative" is of no legal consequence.  Their claims are plainly—and exclusively—derivative, as set forth in Treasury's brief.  Indeed, the Delaware Supreme Court recently reaffirmed that there is only one type of claim that can conceivably be both direct and derivative, and claims of that type can arise only in a narrow set of circumstances not present here.  *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1262-4 (Del. 2016).

3.      For the reasons stated in Treasury's brief, the doctrine of issue preclusion prohibits Plaintiffs from re-litigating the application of Section 4617(f) and HERA's Succession Clause as bars to their claims.  Those issues already have been litigated and resolved—multiple times—*against* other shareholder plaintiffs asserting expressly derivative claims challenging the Third Amendment.  Because the Enterprises are the real parties in interest in any derivative action, issue preclusion bars Plaintiffs' attempt to convince this Court to adopt the arguments that other courts specifically rejected in prior derivative litigation over the Third Amendment.

4.      Even if the Court were not barred by both controlling federal law and issue

preclusion from considering the merits of Counts I and II, both counts fail as a matter of law

because the Third Amendment does not violate governing federal law, nor would it violate

Delaware or Virginia law even if either state's law were found to override the express and

controlling provisions of federal law.

## STATEMENT OF FACTS

## I.      Fannie Mae, Freddie Mac, and the Appointment of FHFA as Conservator

Fannie Mae and Freddie Mac are government-sponsored enterprises, chartered by

Congress, that provide liquidity to the mortgage market by purchasing residential loans from

banks and other lenders, thereby facilitating lenders' ability to make additional loans.  FAC ¶ 30.

The Enterprises own or guarantee trillions of dollars of residential mortgages and mortgage-

backed securities, and have played a key role in housing finance and the U.S. economy.

Beginning in 2006, the Enterprises suffered substantial losses in their mortgage portfolios

and guarantees as a result of the global financial crisis and nationwide housing decline.  FAC

¶ 33.  Indeed, "[i]n 2007–2008, the national economy went into a severe recession due in

significant part to a dramatic decline in the housing market," which pushed the Enterprises "to

the brink of collapse.  Congress concluded that resuscitating Fannie Mae and Freddie Mac was

vital for the Nation's economic health, and to that end passed the Housing and Economic

Recovery Act of 2008 ["HERA"]."  *Perry Capital*, 848 F.3d at 1079 (citation omitted); *see also*

FAC ¶¶ 33-34.  Congress passed HERA in July 2008, thereby creating FHFA as an independent

federal agency to supervise and regulate the Enterprises, as well as the Federal Home Loan

Banks.  *See* Pub. L. No. 110-289, 122 Stat. 2654 (2008), codified at 12 U.S.C. § 4511 *et seq*.

Through HERA, Congress granted the Director of FHFA the discretionary authority to

place Fannie Mae and Freddie Mac in conservatorship "for the purpose of reorganizing,

rehabilitating, or winding up the affairs of a regulated entity." 12 U.S.C. § 4617(a)(2). In September 2008, the Director exercised this discretion and FHFA became conservator of Fannie Mae and Freddie Mac. FAC ¶ 35. HERA provides that, upon its appointment as conservator, FHFA "immediately succeed[s] to . . . *all rights*, titles, powers, and privileges of the regulated entity, and of *any stockholder*, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." 12 U.S.C. § 4617(b)(2)(A)(i) (emphasis added). The statute accords the Conservator broad powers to "operate" and "conduct all business" of the Enterprises. *Id.* § 4617(b)(2)(B)(i). FHFA thus has express, plenary authority as Conservator to:

- "conduct all business of the [Enterprises]," *id.* § 4617(b)(2)(B)(i);

- "perform all functions of the [Enterprises] in the name of the [Enterprises] which are consistent with the appointment as conservator," *id.* § 4617(b)(2)(B)(iii);

- "preserve and conserve the assets and property of the [Enterprises]," *id.* § 4617(b)(2)(B)(iv);

- "take over the assets of and operate the [Enterprises] with all the powers of the shareholders, the directors, and the officers," *id.* § 4617(b)(2)(B)(i);

- "transfer or sell any asset or liability of the [Enterprises] . . . without any approval, assignment, or consent with respect to such transfer or sale," *id*. § 4617(b)(2)(G); and

- "take any [authorized action], which the [FHFA] determines is in the best interests of the [Enterprises] or the [FHFA]," *id.* § 4617(b)(2)(J)(ii).

Reinforcing and facilitating the exercise of the Conservator's broad operational authority, Congress barred any judicial review of the Conservator's actions. Indeed, "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator." *Id.* § 4617(f).

## II.     The PSPAs Between Treasury and the Enterprises

In September 2008, Treasury used its statutory authority (12 U.S.C.

§ 1719(g)(1)(A)(Fannie Mae); *id.* § 1455(*l*)(1)(A) (Freddie Mac)) to purchase securities issued

by the Enterprises by entering into the PSPAs with each Enterprise, through FHFA as

Conservator.  *See* FAC ¶ 36; Amended and Restated Senior Preferred Stock Purchase Agreement

(September 26, 2008) (attached with amendments as **Exhibit A**) ("PSPAs"); *see also* Certificate

of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-

2 (September 7, 2008) ("Treasury Stock Certificate") (attached as **Exhibit B**).[2]  Under the

PSPAs, Treasury committed to advance funds to each Enterprise for each quarter in which that

Enterprise's liabilities exceeded its assets, so as to maintain the positive net worth of that

Enterprise.  PSPAs § 2.2.

Treasury's statutory authority to provide funding to the GSEs required that the

investment "protect the taxpayer."  12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).  In exchange for

the continuing funding commitment that Treasury provided to the GSEs, the PSPAs gave

Treasury a comprehensive and integrated bundle of rights, entitlements, and financial

commitments, including the following:

- Senior Preferred Liquidation Preference,[3] which is valued at $1 billion from each
  GSE, and is increased dollar-for-dollar as either Fannie Mae or Freddie Mac
  draws on its PSPA funding.  FAC ¶ 36; PSPAs § 3.3.  Currently, Treasury has a

---

[2]     Because the PSPAs and Treasury Stock Certificates are "integral" to the First Amended
Complaint, and thereby incorporated into it, the Court may consider these documents in
resolving this motion to dismiss.  *See DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 444 n.2
(3d Cir. 2003).  Exhibit A includes both the Fannie Mae PSPA (with amendments) and the
Freddie Mac PSPA (with amendments).  Likewise, Exhibit B includes both the Fannie Mae and
Freddie Mac Treasury Stock Certificates (as they existed before the Third Amendment).
Because the two PSPAs and two Treasury Stock Certificates are materially identical, their
provisions are cited herein as "PSPAs § ___" and "Treasury Stock Certificate § ___."

[3]     A liquidation preference is "[a] preferred shareholder's right, once the corporation is
liquidated, to receive a specified distribution before common shareholders receive anything."
*Liquidation preference*, BLACK'S LAW DICTIONARY (9th ed. 2009).

combined liquidation preference of approximately $189.4 billion for the two GSEs.  FAC ¶ 48.  (This reflects approximately $187.4 billion in draws, plus the initial $2 billion in liquidation preference.  *See id.*)

- Dividends, paid on a quarterly basis and calculated based on the total amount of the liquidation preference.  *See* FAC ¶ 36.  Prior to the Third Amendment, the Enterprises paid dividends at an annual rate of ten percent of their respective liquidation preferences ($19 billion per year).  Treasury Stock Certificate § 2.  If the Enterprises failed to pay the dividend in cash, then the dividend would accrue at a rate of 12% and be added to Treasury's outstanding liquidation preference.  *Id.* § 2(c).

- Periodic Commitment Fees, to be paid on a quarterly basis beginning on March 31, 2010.  PSPAs §§ 3.1, 3.2.  The periodic commitment fee "is intended to fully compensate [Treasury] for the support provided by the ongoing Commitment following December 31, 2009."  PSPAs § 3.2.  The amount of the fee was to be "determined with reference to the market value of the Commitment as then in effect," as mutually agreed between Treasury and the GSEs, in consultation with the Chairman of the Federal Reserve.  The PSPAs permitted Treasury, in its sole discretion, to waive the fee for up to one year at a time based on conditions in the mortgage market.  *Id.*  Treasury and FHFA initially delayed implementation of the fee, and Treasury then waived the periodic commitment fee in 2011 and 2012.[4]

- Warrants to purchase 79.9% of each Enterprise's common stock.  FAC ¶¶ 8-9, 36; PSPAs § 3.1.

The PSPAs were amended twice in 2009—first to raise the funding commitment for each GSE from $100 billion to $200 billion, and then, in the Second Amendment, to raise the commitment according to a formula that would become capped at the end of 2012.  *See* Ex. A at 30 (First Amendment to PSPAs, dated May 6, 2009); *id.* at 40 (Second Amendment to PSPAs, dated Dec. 24, 2009).

## III.    The Third Amendment to the PSPAs

As of August 8, 2012, Fannie Mae had drawn approximately $116.1 billion, and Freddie Mac had drawn approximately $71.3 billion, from Treasury.  FAC ¶ 48.  Under the terms of the

---

[4]    *See* Fannie Mae, Annual Report (Form 10-K), at 28 (Apr. 2, 2013), http://goo.gl/VbY34k; Freddie Mac, Annual Report (Form 10-K), at 180 (Feb. 28, 2013), http://goo.gl/iMsMY7; Freddie Mac, Annual Report (Form 10-K), at 9 (Mar. 9, 2012), http://goo.gl/XfKr2e.

PSPAs, these draws were necessary to maintain the positive net worth of each company and avoid mandatory statutory receivership. *See* 12 U.S.C. § 4617(a)(4)(A).

On August 17, 2012, Treasury and FHFA, acting as Conservator for the Enterprises, entered into the Third Amendment to the PSPAs. FAC ¶ 15; Ex. A at 52 (Third Amendment to PSPAs, dated Aug. 12, 2012).[5] The Third Amendment eliminated the payment of a fixed dividend and suspended the periodic commitment fee. *Id.* ¶¶ 42; Ex. A at 53-55. Instead, the Enterprises now owe a quarterly variable dividend—referred to in the First Amended Complaint as a "Net Worth Sweep"—based on the Enterprises' earnings, after accounting for prescribed capital reserves. Ex. A at 55 § 3. If an Enterprise's net worth is negative in a quarter, no dividend is due. *Id.* The Third Amendment thus exchanged future payments in an uncertain amount (a variable dividend equal to profits earned) for relief from future obligations (fixed dividends and periodic commitment fee). The Enterprises' annual earnings historically averaged less than $19 billion, the amount owed under the pre-Third Amendment fixed dividend.[6]

## STANDARD OF REVIEW

Defendants move to dismiss all claims pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Where, as here, a Rule 12(b)(1) motion is limited to a facial attack on the pleadings, it is subject to the same standard as a motion brought under Rule 12(b)(6). *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235,

---

[5]    The Treasury Stock Certificates, which were originally executed on September 7, 2008 (Ex. B), were amended on September 27, 2012, to implement the changes agreed to in the Third Amendment to the PSPAs, including the net-worth dividend. *See* Amended and Restated Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, § 2 (attached as **Exhibit C**) ("Amended Treasury Stock Certificate").

[6]    *See* Fannie Mae, Quarterly Report (Form 10-Q) (Aug. 8, 2012) at 4 ("The amount of this dividend payment exceeds our reported annual net income for every year since our inception.") http://goo.gl/bGLVXz; Freddie Mac, Quarterly Report (Form 10-Q) (Aug. 7. 2012) at 8 ("our annual cash dividend obligation to Treasury on the senior preferred stock of $7.2 billion exceed[s] our annual historical earnings in all but one period.") http://goo.gl/2dbgey.

243 (3d Cir. 2012).  Under Rule 12(b)(1) and 12(b)(6), the plaintiff "must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, [including] the right to jurisdiction), rather than facts that are merely consistent with such a right," and the court may disregard allegations that "are no more than conclusions" and therefore "not entitled to the assumption of truth."  *Id.* at 243-44 (citations and internal quotation marks omitted).

## ARGUMENT

### I.      Section 4617(f) Bars Plaintiffs' Claims Seeking Equitable and Declaratory Relief

To enable the Conservator to carry out its functions, Congress expressly prohibited the courts from taking action to second-guess the Conservator's conduct, mandating that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator."  12 U.S.C. § 4617(f).  As the D.C. Circuit recently explained in affirming the dismissal of other shareholder claims challenging the Third Amendment, "Section 4617(f)'s . . . plain statutory text" prohibits any "interference—through judicial injunctions, declaratory judgments, or other equitable relief—with FHFA's statutorily permitted actions as conservator." *Perry Capital*, 848 F. 3d at 1087.  Courts consistently apply Section 4617(f) to bar all claims seeking relief that would "restrain or affect" the exercise of the powers of FHFA as Conservator of the GSEs.  *See, e.g.*, *id.* ("The plain statutory text draws a sharp line in the sand against litigative interference—through judicial injunctions, declaratory judgments, or other equitable relief—with FHFA's statutorily permitted actions as conservator or receiver."); *Robinson*, 2016 WL 4726555 at *8 ("[S]o long as FHFA is exercising judgment under one of its enumerated powers . . . this court may not enjoin that act . . . .") (internal quotation marks and citation omitted); *Cty. of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013) ("Because . . . FHFA acted within its powers as conservator, neither we nor the district court have jurisdiction over

Plaintiffs'-Appellees' [APA and state law] claims"); *Leon Cty. v. FHFA*, 700 F.3d 1273, 1278-79

(11th Cir. 2012) (affirming dismissal of APA claims based on operation of Section 4617(f)).[7]

These decisions under HERA are consistent with the substantial body of case law

interpreting the materially identical provision governing Federal Deposit Insurance Corporation

("FDIC") conservatorships and receiverships, 12 U.S.C. § 1821(j).[8]  Section 1821(j) "effect[s] a

sweeping ouster of courts' power to grant equitable remedies," and applies "regardless of the

claimant's likelihood of success on the merits of his underlying claims."  *Freeman v. F.D.I.C.*,

56 F.3d 1394, 1399 (D.C. Cir. 1995).  As the Third Circuit has recognized, this provision is

intended "to permit the FDIC to perform its duties as conservator or receiver promptly and

effectively without judicial interference."  *Hindes v. F.D.I.C.*, 137 F.3d 148, 160 (3d Cir. 1998).[9]

Indeed, "given the breadth of the statutory language . . . the statute would appear to bar a court

from acting in virtually all circumstances."  *Nat'l Trust for Historic Pres. in U.S. v. F.D.I.C.*, 21

F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring).

Because Section 4617(f) "precludes injunctive and declaratory relief which would

restrain or affect the powers of the [conservator or receiver]," *Hindes*, 137 F.3d at 166, it bars

nearly all of the relief Plaintiffs seek here—including Plaintiffs' requests for (i) "equitable and

injunctive relief . . . including rescission of the Net Worth Sweep and restitution of the monies

---

[7]    *See also, e.g.*, *Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012); *Massachusetts v. FHFA*, 54 F. Supp. 3d 94, 101-02 (D. Mass. 2014); *Gail C. Sweeney Estate Marital Trust v. U.S. Treasury Dep't*, 68 F. Supp. 3d 116, 125-26 (D.D.C. 2014).

[8]    Section 1821(j) provides that "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."  12 U.S.C. § 1821(j).  "In analyzing the limits of the Court's authority under § 4617(f), the Court may turn to precedent relating to [Section 1821(j)]."  *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 674 F. Supp. 2d 483, 493 (S.D.N.Y. 2009) (collecting cases).

[9]    Gary Hindes, a Plaintiff in this case, was one of the plaintiff-appellants in *Hindes*.

paid by the Companies to Treasury pursuant thereto," (ii) declarations that the Net Worth Sweep is void and unenforceable, and (iii) other declaratory relief.  FAC, Prayer for Relief C-F, H.

The analysis required to determine whether Section 4617(f) bars judicial review is straightforward and "quite narrow." *Bank of Am. Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010) (discussing 12 U.S.C. § 1821(j)).  The court "must first determine whether the challenged action is within the [Conservator]'s power or function" under HERA.  *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1017 (8th Cir. 2013) (citing *Bank of Am.*, 604 F.3d at 1243).  If so, the Conservator "is protected from all court action that would 'restrain or affect' the exercise of those powers or functions." *Bank of Am.*, 604 F.3d at 1243.[10]  Indeed, "injunctive relief will be denied even where the [conservator or receiver] acts in violation of other statutory schemes," so long as it is carrying out a statutory power or function of its own.  *Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir. 1992); *see also Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir. 1993) (holding allegations that conservator or receiver acted "improperly or unlawfully" cannot overcome Section 1821(j) so long as conservator or receiver "did not engage in an activity outside its statutory powers").

By definition, conservators are appointed only in the most difficult circumstances, where hard business and operational choices must be made every day.  Inevitably, shareholders will disagree with some of these decisions, as Plaintiffs do here.  But if conservators can be hauled into court and put through the rigors of protracted litigation every time a shareholder questions a

---

[10]    *See also Cty. of Sonoma*, 710 F.3d at 992 ("If the [challenged action] falls within FHFA's conservator powers, it is insulated from review and th[e] case must be dismissed."); *Town of Babylon*, 699 F.3d at 228 ("A conclusion that the challenged acts were directed to an institution in conservatorship and within the powers given to the conservator ends the [Section 4617(f)] inquiry."); *Furgatch v. Resolution Trust Corp.*, Civ. No. 93-20304 SW, 1993 WL 149084, at *2 (N.D. Cal. Apr. 30, 1993) ("[T]he only relevant question . . . is whether the conservator or receiver is carrying out a statutory function or power.  If so, no injunction may issue.").

conservator's decision, conservators will spend an inordinate amount of time litigating past decisions at the expense of time that should be devoted to ongoing conservatorship operations. Statutes such as Section 4617(f) embody Congress's policy judgment that enabling conservators to focus on the work Congress empowered and directed them to do without the distraction of litigation is more important than vesting the courts with jurisdiction to hear and adjudicate all claims of all claimants at all times.  As the district court in *Perry Capital* observed (and as affirmed by the D.C. Circuit): "Requiring the Court to evaluate the merits of FHFA's decision-making each time it considers HERA's jurisdictional bar would render the anti-injunction provision hollow, disregarding Congress' express intention to divest the Court of jurisdiction to restrain FHFA's 'exercise of [its] powers or functions' under HERA—*i.e.,* how FHFA employs its powers or functions."  *Perry Capital*, 70 F. Supp. 3d at 226 (quoting 12 U.S.C. § 4617(f)).

## A. The Third Amendment Was an Exercise of the Conservator's Broad Statutory Powers

HERA "endows FHFA with extraordinarily broad flexibility to carry out its role as conservator." *Perry Capital*, 848 F.3d at 1087.  Indeed, HERA grants the Conservator "broad powers to operate Fannie and Freddie," to "assume complete control" over the Enterprises in conservatorship, and to exercise "exclusive authority over [their] business operations."  *FHFA v. City of Chicago*, 962 F. Supp. 2d 1044, 1060 (N.D. Ill. 2013); *see also Roberts*, 2017 WL 1049841, at *2 (describing conservator powers as "expansive").  FHFA's powers under HERA are at least as great as those given to conservators and receivers under FIRREA, which courts have also described as "extraordinary," *MBIA Ins. Corp. v. F.D.I.C.*, 708 F.3d 234, 236 (D.C. Cir. 2013), and "exceptionally broad."  *In re Landmark Land Co. of Okla., Inc.*, 973 F.2d 283, 288 (4th Cir. 1992).

13

Specifically, Congress empowered the Conservator to (among other things) "operate" the GSEs, "carry on [their] business," "contract" on their behalf, and "transfer or sell any [GSE] asset or liability . . . without any approval, assignment, or consent." 12 U.S.C. § 4617(b)(2). Moreover, the statute "endows FHFA with extraordinarily broad flexibility to carry out its role" as FHFA sees fit, *Perry Capital*, 848 F.3d at 1088, authorizing the Conservator to exercise all of its powers in the manner the Conservator "*determines* is in the best interests of the [Enterprises] or the Agency." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added).

By executing the PSPAs and the Third Amendment, the Conservator did precisely that; it exercised its power to "operate the [GSEs]" and to "conduct all business of the [GSEs]" in the manner the Conservator "determines is in the [GSEs' or FHFA's] best interests." 12 U.S.C. § 4617(b)(2)(B)(i), (J)(ii). The PSPAs are funding agreements that provide the Enterprises with a capital backstop of hundreds of billions of dollars. Just as securing essential funding is a quintessential act for the conservator of a financial institution—which authority Plaintiff does not dispute or challenge—so too is agreeing to amend the PSPAs in a manner the Conservator believes, in its judgment, is in the best interests of the GSEs or FHFA. *See* 12 U.S.C. § 4617 (b)(2)(J)(ii).

Further, Plaintiffs describe the Third Amendment as transferring Enterprise assets to Treasury, *see* FAC ¶¶ 54, 83, and thus concede any issue of Conservator authority. HERA authorizes the Conservator to "transfer or sell any asset" of the GSEs "without any approval, assignment, or consent," 12 U.S.C. § 4617(b)(2)(G), in the manner "[FHFA] determines is in the best interests of the [GSEs] or [FHFA]," *id.* § 4617(b)(2)(J)(ii). This transfer provision "does not provide any limitation"; indeed, "[i]t is hard to imagine more sweeping language." *Gosnell v.*

*F.D.I.C.*, No. 90-1266L, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991), *aff'd*, 938 F.2d 372

(2d Cir. 1991) (interpreting materially identical 12 U.S.C. § 1821(d)(2)(G)(i)). [11]

As the D.C. Circuit held in addressing this exact issue, "FHFA's execution of the Third

Amendment falls squarely within its statutory authority to '[o]perate the [Companies,]' 12

U.S.C. § 4617(b)(2)(B), to 'reorganiz[e]' their affairs, *id.* § 4617(a)(2), and to 'take such action

as may be . . . appropriate to carry on the[ir] business,' *id.* § 4617(b)(2)(D)(ii)." *Perry Capital*,

848 F.3d at 1088.  The D.C. Circuit added that "[r]enegotiating dividend agreements, managing

heavy debt and other financial obligations, and ensuring ongoing access to vital yet hard-to-

come-by capital are quintessential conservatorship tasks designed to keep the Companies

operational." *Id.*  Because the Conservator's "management of Fannie's and Freddie's assets,

debt load, and contractual dividend obligations during their ongoing business operation sits at the

core of FHFA's conservatorship function," actions "to enjoin FHFA from implementing [the

Third Amendment]," "to declare the Third Amendment invalid," or "to vacate the Third

Amendment" seek relief "squarely within Section 4617(f)'s plain textual compass" and are

barred.  *Id.* at 1087-88.

The D.C. Circuit is not alone in reaching this conclusion: every other court to have

addressed the issue likewise has found that the "FHFA's powers as conservator . . . plainly allow

for the actions contemplated by the Third Amendment." *Saxton*, 2017 WL 1148279, at *10.  *See*

*also Roberts*, 2017 WL 1049841, at *8 ("All told, the Plaintiffs have not sufficiently alleged that

---

[11]   *See also Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007) (holding receiver's
transfer of assets protected by Section 1821(j)); *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 53
(2d Cir. 1994) (holding receiver's transfer of assets, allegedly in breach of a contract, was
authorized by Section 1821(d)(2)(G)(i) and thus Section 1821(j) barred injunction, "regardless of
[plaintiff]'s ultimate chance of success on his contract claim"); *Waterview Mgmt. Co. v. FDIC*,
105 F.3d 696, 700-02 (D.C. Cir. 1997) (similar); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d
1320, 1323, 1328-29 (6th Cir. 1993) (holding Section 1821(j) barred claims seeking rescission of
a transaction in which the receiver "transferred substantially all" of the institution's assets).

FHFA acted outside the bounds of its statutory authority" when executing the Third

Amendment); *Robinson*, 2016 WL 4726555, at *5-8 (holding FHFA acted within its powers and

functions when executing the Third Amendment); *Cont'l W. Ins. Co.*, 83 F. Supp. 3d at 840 n.6

(S.D. Iowa 2015) (same).

This case is no different:  Plaintiffs challenge precisely the same transaction and seek

precisely the same types of relief as was sought—and rejected—in *Perry Capital* and the other

actions.  Because the Conservator acted squarely within its statutory powers in executing the

Third Amendment, Section 4617(f) likewise bars Plaintiffs' claims here.[12]

### B.  Section 4617(f) Applies Notwithstanding Plaintiffs' Allegation that the Third Amendment Violates State Law

Plaintiffs cannot avoid 4617(f)'s preclusive effect by alleging the Conservator violated

some other law—such as state statutes concerning the issuance of preferred stock—in executing

the Third Amendment.  *See* FAC ¶¶ 79-94 (relying on 8 Del. Code § 151(c) or Va. Code § 13.1-

638).  In interpreting the materially-identical Section 1821(j), the Third Circuit has repeatedly

held that, so long as a conservator or receiver is carrying out one of its statutorily-defined powers

or functions, courts are prohibited from enjoining that conduct, *even if* the conservator or

receiver allegedly violated state law, federal law, or its own regulations in the process.

---

[12]  Congress's enactment of the Consolidated Appropriations Act, 2016 (the "Act") on December 18, 2015, *see* Pub. L. No. 114-113, § 702, Tit. VII, Div. O, 129 Stat. 2242 (2015), also confirms that the Conservator had the statutory authority to execute the Third Amendment.  The Act bars Treasury from selling or disposing of its preferred shares in the GSEs before January 1, 2018, but it otherwise leaves in place Treasury's rights under the PSPAs—including the Third Amendment, which is expressly referenced in the "Definitions" section.  Pub. L. No. 114-113, § 702(a).  Congress's decision to circumscribe Treasury's authority in one area but to leave intact other provisions of the PSPAs demonstrates that Congress believes that the Conservator and Treasury had the statutory authority to enter the Third Amendment.  *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("[w]here an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." (internal quotation marks and citation omitted)); *Davis v. Devine*, 736 F.2d 1108, 1113 (6th Cir. 1984) (similar).

For example, in *Rosa v. Resolution Trust Corp.*, the plaintiffs attempted to enjoin the RTC as conservator and receiver based on its alleged violation of ERISA.  938 F.2d 383 (3d Cir. 1991).  The plaintiffs in *Rosa* argued that "while RTC as conservator and receiver is authorized to run the affairs of a troubled institution . . . it is only authorized to run them in a legal manner." *Id.* at 397.  The Third Circuit squarely rejected this argument: "[w]e find no such limitation in the language of § 1821(j)," the analogous jurisdiction-withdrawal provision under FIRREA.  *Id.* The court instead held the powers of the conservator and receiver were "defined by" their governing statute, FIRREA, without any exception or limitation for compliance with other laws. *Id.* at 398.  The Third Circuit concluded that the RTC's actions fit within its "quite broad" statutory powers as conservator and receiver, and thus Section 1821(j) barred plaintiffs' demands for equitable relief.  *Id.*  The court "naturally express[ed] no opinion as to the alleged wrongfulness of RTC's conduct."  *Id.* at 400; *see also Gross,* 974 F.2d at 407 (reaffirming *Rosa* and observing that "where the [conservator or receiver] performs functions assigned it under the statute, injunctive relief will be denied *even where [it] acts in violation of other statutory schemes*" (emphasis added)).

Since *Rosa* and *Gross*, many other courts—including the Fourth, Fifth, Eleventh, and D.C. Circuits—also have embraced the same principle, holding that compliance with other laws, including state laws, cannot constrain the powers and functions of a conservator or receiver.  *See, e.g.*, *Volges*, 32 F.3d at 52 ("The fact that the [conservator's or receiver's conduct] might violate [plaintiff]'s state law contract rights does not alter the calculus [under Section 1821(j)]").[13]  To

---

[13]    *See also In re Landmark Land Co. of Carolina*, No. 96-1404, 1997 WL 159479, at *4 (4th Cir. Apr. 7, 1997) ("The mere fact that an action of the FDIC [as conservator or receiver] may violate state contract law . . . does not entitle a federal court to enjoin the FDIC . . . ."); *RPM Invs., Inc. v. Resolution Trust Corp.*, 75 F.3d 618, 621 (11th Cir. 1996) ("Even claims seeking to enjoin the [as conservator or receiver] from taking allegedly unlawful actions  are subject to the

*[Footnote continues on following page]*

17

hold otherwise would effectively negate the power of statutes like Sections 4617(f) and 1821(j), as every claim against a conservator or receiver necessarily allege some type of unlawful conduct, which—under Plaintiffs' view—would remove the protections of the statute. *See Rosa*, 938 F.2d at 397 (observing that a limitation on Section 1821(j) for compliance with other laws "would undermine the purpose of the statute, namely, to permit [the] conservator or receiver to function without judicial interference"); *Volges*, 32 F.3d at 52-53 ("If every party to an executory contract entered into by the [conservator or receiver] could obtain injunctive relief to prevent an alleged breach, the anti-injunction mandate would be severely restricted, if not meaningless.").

By executing the Third Amendment, the Conservator acted squarely within its statutory powers and functions. Thus, Section 4617(f) bars Plaintiffs' claims seeking equitable and declaratory relief, notwithstanding Plaintiffs' misguided allegations that the Third Amendment was incompatible with state law.

### C.      Section 4617(f) Applies Notwithstanding Plaintiffs' Allegations that the Conservator Did a Bad Job or Acted With an Improper Motive

Plaintiffs allege that FHFA's decision to enter into the Third Amendment was the product of "self-dealing," done at Treasury's direction, purportedly designed to "capitalize on the Companies' strong recovery (and ensure that their stockholders could not capitalize on it)," and lacked adequate consideration, thereby harming the Enterprises and their shareholders. *See, e.g.*, FAC ¶¶ 15, 42, 46-49, 73. But Plaintiffs cannot avoid Section 4617(f)'s bar on judicial review

---

*[Footnote continued from previous page]*
jurisdictional bar of 1821(j)"); *Ward*, 996 F.2d at 103 (rejecting illegality limit on receiver's powers and observing the plaintiff "fails (or refuses) to recognize the difference between the exercise of a function or power that is clearly outside the statutory authority of the RTC on the one hand [and thus not protected by Section 1821(j)], and improperly or even unlawfully exercising a function or power that is clearly authorized by statute on the other [and thus protected by Section 1821(j)]"); *Nat'l Trust for Historic Pres. v. F.D.I.C.*, 995 F.2d 238, 240 (D.C. Cir. 1993) ("We do not think it possible, in light of the strong language of § 1821(j), to interpret the FDIC's 'powers' and 'authorities' to include the limitation that those powers be subject to—and hence enjoinable for non-compliance with—any and all other federal laws.").

by allegations that the Conservator did a bad job or acted based on an improper motive.  So long as Conservator action is not "clearly outside its statutory powers" and functions, *see Gross*, 974 F.2d at 407, Section 4617(f) applies and "immuniz[es]" the Conservator from all "outside second-guessing," *see Nat'l Trust*, 995 F.2d at 240-41.  Put simply, the application of Section 4617(f) "does not hinge on [the court's] view of the proper exercise of otherwise-legitimate powers."  *Gross*, 974 F.2d at 408 (applying Section 1821(j)); *see also Cty. of Sonoma*, 710 F.3d at 993 ("[I]t is not our place to substitute our judgment for FHFA's" as Conservator).

Accordingly, courts have uniformly rejected shareholder attempts to challenge the merits of or motives behind the Third Amendment.  As the D.C. Circuit held in *Perry Capital*, "Section 4617(f) prohibits us from wielding our equitable relief to second-guess either the dividend-allocating terms that FHFA negotiated on behalf of the Companies, or FHFA's business judgment that the Third Amendment better balances the interests of all parties involved, including the taxpaying public, than earlier approaches had."  848 F.3d at 1095.  Indeed, "[n]othing in [HERA] confines FHFA's conservatorship judgments to those measures that are driven by financial necessity.  And for purposes of applying Section 4617(f)'s strict limitation on judicial relief, allegations of motive are neither here nor there, as the dissenting opinion agrees (at 20)."  *Id*. at 1093; *see also Saxton*, 2017 WL 1148279 at *10 ("Whatever Plaintiffs' views of the wisdom of the Third Amendment, FHFA's adherence to its statutory role as conservator does not turn on the wisdom of its decision-making."); *Roberts*, 2017 WL 1049841 at *6 (Section 4617(f) "makes no exception for instances when FHFA supposedly had an improper motive but acted within its authority"); *Cont'l W. Ins. Co.*, 83 F.Supp.3d at 840 n.6 (Section 4617(f) prohibits "wad[ing] into the merits or motives of FHFA and Treasury's actions").

19

## II.     HERA Bars Shareholder Claims During Conservatorship

Plaintiffs' claims fail for an additional, independently dispositive reason:  HERA bars

prosecution of all shareholder claims during conservatorship, including claims seeking money

damages or equitable relief.  Congress provided that when FHFA is appointed Conservator, it

succeeded to "all rights" of the Enterprises' stockholders, including Plaintiffs.  12 U.S.C.

§ 4617(b)(2)(A).  Here, Plaintiffs purport to assert "rights . . . of [a] stockholder"—all of their

claims (styled as "direct and derivative") relate to shareholder interests—but the Conservator

now holds "all" such rights, leaving Plaintiffs with no interest to assert and no enforceable claim.

### A.     The Conservator Succeeds, at a Minimum, to Shareholders' Ability to Pursue Derivative Claims During Conservatorship

Congress could not have been more clear: upon its appointment, the Conservator

"immediately succeed[ed] to . . . *all rights, titles, powers, and privileges* of the [GSEs], and *of*

*any stockholder*, officer, or director *of [the GSEs]* with respect to the [GSEs] and the assets of

the [GSEs]."  12 U.S.C. § 4617(b)(2)(A)(i) (emphases added).  HERA's broad, unequivocal

language "evidences Congress's intent to transfer as much power as possible to the FHFA when

acting as [the Enterprises'] conservator."  *Pagliara v. Fed. Home Loan Mortg. Corp.*, 203 F.

Supp. 3d 678, 689 (E.D. Va. 2016); *see also Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir.

2012) (observing Congress sought to ensure "that nothing was missed" and to "transfer[]

everything it could to the [Conservator]") (citation omitted).  Accordingly, "[t]he shareholders'

rights are now the FHFA's."  *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d

347, 351 (S.D.N.Y. 2009).

Courts uniformly have held that the provision of HERA transferring shareholder rights to

the Conservator bars Enterprise stockholders from asserting *at least* shareholder derivative

claims during the conservatorships.  For example, in *Kellmer*, the D.C. Circuit affirmed the

district court's substitution of the Conservator in place of the plaintiffs—shareholders of Fannie Mae—who had asserted a variety of shareholder derivative claims.  The Court held:

> [T]o resolve this issue, we need only heed Professor Frankfurter's timeless advice: "'(1) Read the statute; (2) read the statute; (3) read the statute!'"  HERA provides that FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges . . . of any stockholder."  12 U.S.C. § 4617(b)(2)(A).  ***This language plainly transfers shareholders' ability to bring derivative suits—a "right[ ], title[ ], power[ ], [or] privilege[ ]"—to FHFA***.

*Kellmer*, 674 F.3d at 850 (emphasis added) (internal citation omitted).  "HERA's plain language [thus] bars shareholder derivative suits, without exception."  *Perry Capital*, 70 F. Supp. 3d at 232, *aff'd* 848 F.3d at 1104; *see also Cont'l W.*, 83 F. Supp. 3d at 840 n.6 ("HERA grants all shareholder rights, including the right to bring a derivative suit, to FHFA.").

The transfer of all rights to the Conservator also works to effectuate other key provisions of HERA, including that the Conservator exclusively "determines [what] is in the best interests" of the GSEs, 12 U.S.C. § 4617(b)(2)(J)(ii), and that no court may "restrain" or "affect" the Conservator's exercise of its statutory power, *id.* § 4617(f).  Together, these provisions vest total control over the GSEs in the Conservator, not the shareholders, and thus bar Plaintiff's claims.[14]

## B.     Plaintiffs' Claims Are Derivative, Not Direct

As explained in Treasury's motion to dismiss, Plaintiffs' claims are purely derivative (*i.e.*, brought on behalf of and to redress injuries to the Enterprises)—not "direct and derivative,"

---

[14]     Indeed, numerous courts have held that Section 4617(f) *itself* displaces shareholder plaintiffs' attempts to pursue derivative claims.  *See Sweeney*, 68 F. Supp. 3d at 126 (concluding shareholder "plaintiff's lawsuit would 'affect' and 'interfere' with the Conservator's exercise of its powers"); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009) ("find[ing] that allowing the [shareholder] plaintiffs to remain in this action would violate § 4617(f)"); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d 1, 4 n.4 (D.D.C. 2009) ("allowing [shareholder] plaintiffs to continue to pursue derivative claims independent of FHFA would require this Court to take action that would 'restrain or affect' FHFA's discretion, which HERA explicitly prohibits"), *aff'd sub nom. Kellmer*, 674 F.3d 848.

as Plaintiffs have attempted to label them in the First Amended Complaint.  *See* FAC at Counts I

through IV.  The FHFA Defendants adopt and incorporate by reference Treasury's argument that

Plaintiffs' claims are purely derivative.  *See* Treasury Mot. to Dismiss at Sec. II.  Plaintiffs'

claims thus fall within the well-settled rule that HERA bars all shareholder derivative claims

during conservatorship.  Moreover, whether Plaintiffs' claims are characterized as derivative,

direct, or "direct and derivative" is irrelevant because the Conservator succeeds to "all"

shareholder rights and, when interpreting HERA, "all" means "all."  *See Delaware Cty., Pa. v.*

*FHFA*, 747 F.3d 215, 223 (3d Cir. 2014) (interpreting HERA's "phrase 'all taxation' to mean

precisely what it says"); *Pagliara*, 203 F. Supp. 3d at 686 (observing HERA's succession

provision "is extremely broad" and "means what it plainly says").[15]

### C.     There Is No "Conflict of Interest" Exception to HERA

In an effort to evade the clear statutory language transferring "all" shareholder rights to

the Conservator, Plaintiffs allege they are "entitled to pursue the derivative claims alleged herein

as a result of FHFA's manifest conflict of interest."  FAC ¶ 74; *see also id.* ¶ 76.  But there is no

such "conflict of interest" exception in HERA, and every court that has addressed this issue

under HERA—including the D.C. Circuit—has soundly rejected the creation of any such

exception.  *See Perry Capital*, 848 F.3d at 1106 (finding such an exception would be "contrary"

to "the plain statutory text" and holding that "the Succession Clause does not permit shareholders

to bring derivative suits on behalf of the Companies even where the FHFA will not bring a

---

[15]    The FHFA Defendants respectfully disagree with the D.C. Circuit's holding in *Perry Capital* that HERA does not bar direct shareholder claims.  *See* 848 F.3d at 1104-05.  To read a "direct claims" exception into HERA would render part of the statute meaningless because the Conservator already can pursue claims on behalf of the Enterprises by its succession to "all" rights of the Enterprises themselves.  Further, the purportedly direct shareholder claims at issue in *Perry Capital* were undoubtedly brought "with respect to the [Enterprises] and the[ir] assets," and thus fit well within HERA's Succession provision.  12 U.S.C. § 4617(b)(2)(A)(i).  In all events, because Plaintiffs' claims in this case are purely derivative, the Court need not reach this issue of whether the Conservator also succeeds to direct shareholder claims.

derivative suit due to a conflict of interest"); *Saxton*, 2017 WL 1148279, at *12 ("The court finds no ambiguity in the provision's meaning and, therefore, refuses to judicially alter the provision to allow for an unstated conflict-of-interest exception."); *Edwards v. Deloitte & Touche, LLP*, No. 16-21221-CIV, 2017 WL 1291994, at *7 (S.D. Fla. Jan. 18, 2017) ("Looking at the plain wording of HERA's succession clause, there is no exception to the bar on derivative suits."); *Pagliara*, 203 F. Supp. 3d at 691 n. 20 ("All courts known to have considered that [conflict of interest] argument in the context of HERA have found the argument unavailing.").

While two cases have applied a conflict-of-interest exception under FIRREA's analogous succession provision for FDIC receiverships, those cases have been roundly criticized and limited to their specific facts. *See First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1295-96 (Fed. Cir. 1999); *Delta Savs. Bank v. United States*, 265 F.3d 1017, 1021-24 (9th Cir. 2001). Indeed, the D.C. Circuit in *Perry Capital* squarely rejected these decisions as poorly reasoned outliers, holding that neither decision supports the conclusion that Congress intended to create a conflict-of-interest exception. 848 F.3d at 1105-06. The court explained that these cases improperly relied on the historic rationale for shareholder derivative actions while disregarding the plain statutory language of FIRREA (and HERA). *Id.* The court recognized it would "make[] little sense" to base an exception to HERA's rule *against* derivative suits "on the purpose of the derivative suit mechanism" (*i.e.*, to permit shareholders to assert the interests of the corporation where managers or directors have a conflict of interest that prevents them from doing so), particularly in view of "the plain statutory text to the contrary." *Id.* at 1106. Indeed, "the existence of a rule against shareholder derivative suits, § 4617(b)(2)(A)(i), indicates that courts cannot use the *rationale* for why derivative suits are available to

shareholders as a legal tool . . . to carve out an *exception* to that prohibition. . . . Such an

exception would swallow the rule." *Perry Capital*, 70 F. Supp. 3d at 231.[16]

### III. Plaintiffs' Claims are Barred by the Doctrine of Issue Preclusion

Plaintiffs' claims also fail because Plaintiffs are bound by the final judgments in *Perry*

*Capital* and *Saxton*, in which other shareholder derivative plaintiffs sued FHFA and Treasury

challenging the Third Amendment.  In *Saxton*, the court held the shareholder's APA claims were

derivative, not direct, and that Section 4617(f) bars those claims.  2017 WL 1148279 at *10.

And in both *Perry Capital* and *Saxton*, the courts dismissed expressly derivative claims on the

ground that HERA's Succession Provision bars shareholder derivative claims during

conservatorship, irrespective of any alleged conflict of interest.  *Id*. at *12; *Perry Capital*, 848

F.3d at 1105-06.  Because the Enterprises were the real parties in interest in these derivative

suits, the *Perry Capital* and *Saxton* decisions have binding, issue-preclusive effect here.  The

FHFA Defendants adopt and incorporate by reference Treasury's argument that Plaintiffs' claims

are barred by the doctrine of issue preclusion.  *See* Treasury Mot. to Dismiss at Sec. V.

### IV. Counts I and II Fail to State a Claim That the Treasury Stock Certificates, As Amended by the Third Amendment, Violate Delaware or Virginia Statutes

In Counts I and II, Plaintiffs allege that the net-worth dividend contained in the Treasury

Stock Certificates (as amended by the Third Amendment) is invalid under Delaware and Virginia

law, and thus should be voided.  FAC ¶¶ 79-94.  Assuming *arguendo* that this Court has

jurisdiction to consider Plaintiffs' claims--and it does not--Counts I and II fail for two additional

---

[16]    Even assuming *arguendo* that *First Hartford* and *Delta Savings* were not wrongly decided, their limited holdings should not be expanded to conservatorships.  *First Hartford* and *Delta Savings* involved receiverships, and their flawed rationale "makes still less sense in the conservatorship context."  *Perry Capital*, 70 F. Supp. 3d at 231 n.30.  The decisions themselves emphasized the "very narrow range of circumstances" in which the purported conflict-of-interest exception applies.  *First Hartford*, 194 F.3d at 1295; *see also Delta Savs.*, 265 F.3d at 1023.

reasons.  *First*, pursuant to the express terms of the Enterprises' charters and the Treasury Stock

Certificates, federal law—not state law—governs the Conservator's authority to agree to the

Third Amendment, and federal law permits the Third Amendment.  *Second*, even if state law

governs, the net worth dividend does not violate the state law statutes upon which Plaintiffs rely.

### A.  Federal Law, Not State Law, Governs the Conservator's Ability to Agree to the Third Amendment and the Resulting Treasury Stock Certificates

The Enterprises are creatures of federal law—*not* state law—notwithstanding Plaintiffs'

attempts to impose upon the Enterprises purported requirements of Delaware and Virginia law.

Congress itself issued the federal charters creating the Enterprises, and those charters do not

incorporate any state law.  *See* 12 U.S.C. § 1716 *et seq*.; *id*. § 1451 *et seq*.

In fact, the Enterprises' federal statutory charters expressly address the precise issues at

stake in this litigation:  the terms for issuance of stock and payment of dividends by the

Enterprises.  In particular, the statutory charters authorize the Enterprises (and thus the

Conservator) to: (1) issue preferred stock "on such terms and conditions as the board of directors

shall prescribe," 12 U.S.C. § 1718(a); *id*. § 1455(f); and (2) make dividend payments to

Enterprise stockholders in the manner "as may be declared by the board of directors."  *Id*.

§ 1718(c)(1); *id*. § 1452(b)(1).  Accordingly, the Enterprises' boards of directors (and thus the

Conservator) have broad, unqualified authority under *federal* law to issue preferred stock and

dividends in the manner the Enterprises' boards (and the Conservator) see fit.  This necessarily

includes the Third Amendment to the Treasury Preferred Stock and the payment of dividends on

that stock.  Additionally, under HERA, the Conservator has broad powers to conduct all business

of the Enterprises and their boards—and also to exercise all rights and powers of the Enterprises'

shareholders—which likewise include the power to execute the Third Amendment and issue

dividends thereunder.  *See supra* Sec. I.

In their complaint, Plaintiffs point to a federal regulation, 12 C.F.R. § 1710.10, issued in

2002 by the Office of Federal Housing Enterprise Oversight ("OFHEO"), FHFA's predecessor

agency, to argue that state law applies here.  *See* FAC ¶¶ 2, 32.  But that regulation provides first

and foremost that the Enterprises "shall comply with [their] applicable chartering acts and other

Federal law, rules, and regulations."  12 C.F.R. § 1710.10(a).  The regulation simply directs the

Enterprises to follow Delaware law (or the law of the jurisdiction in which the principal office of

the Enterprise sits) *only* with respect to issues *not* already addressed in the Enterprises' federal

charters.  *See* 67 Fed. Reg. 38361 (Jun. 4, 2002).  Indeed, in issuing the regulation, OFHEO

specifically observed that:

> The chartering acts contain several provisions related to matters of
> corporate governance[, including] common and preferred stock.
> The chartering acts, however, are silent with respect to *other*
> corporate governance provisions that are commonly addressed for
> state-chartered corporations under State law.

*Id*. at 38362 (emphasis added); *see also id*. at 38364 (observing state law is *not* "incorporated

wholesale by the election of [state] law by an Enterprise").  Additionally, the regulation makes

clear that state law applies only "[t]o the extent not inconsistent with" the Enterprises' charters

and other federal law.  12 C.F.R. § 1710.10(b).[17]

Here, the charters are not "silent" regarding the terms for issuance of stock and payment

of dividends by the Enterprises—they address those topics directly.  Accordingly, no state law

applies.  Through Counts I and II,  Plaintiffs contend that Delaware and Virginia law supply

---

[17]    The Treasury Stock Certificates likewise provide that federal law governs those certificates.
*See* Ex. C § 10(e) (Amended Treasury Stock Certificate) (providing that the rights and
obligations under the stock "shall be construed in accordance with and governed by the laws of
the United States").  While those certificates also provide that the laws of Delaware (for Fannie
Mae) and Virginia (for Freddie Mac) "shall serve as the federal rule of decision," the certificates
state that state law shall *not* apply "where such law is inconsistent with the Company's enabling
legislation, its public purposes or any provision of this Certificate."  *Id*.

more stringent requirements for the issuance of preferred stock than do the charters.  While

Plaintiffs are wrong in their interpretation of Delaware and Virginia law, *see infra* Sec. IV(B),

any state law requirements that would conflict with HERA or the Enterprises' federal statutory

charters, including imposing limits on the discretion of the Enterprises' boards or the

Conservator to issue stock "on such terms and conditions" as they see fit, are preempted.

Conflict preemption applies even where "federal and state law [are] not . . . contradictory

on their faces . . . .  It is sufficient that the state law 'impose[s] . . . additional conditions' not

contemplated by Congress." *Surrick v. Killion*, 449 F.3d 520, 532 (3d Cir. 2006) (second

alteration in original) (citation omitted).  Conflict preemption applies where state law "would

frustrate the federal scheme." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 209 (1985); *see

also Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (holding conflict

preemption applies where federal statute provides banks broad authority to engage in an activity

that state law prohibits).  For example, in *Fasano v. Fed. Reserve Bank of N.Y.*, the Third Circuit

held that a federal statute permitting Federal Reserve Banks to "dismiss [employees] at pleasure"

preempted state statutes that "indisputably impose substantive and procedural burdens well

beyond those imposed by federal law, and thereby frustrate Congressional intent to provide the

Federal Reserve Banks with relatively unfettered employment discretion." 457 F.3d 274, 283

(3d Cir. 2006); *see also F.D.I.C. v. Bank of Boulder*, 911 F.2d 1466, 1472-73 (10th Cir. 1990)

(federal law permitting FDIC to purchase assets preempted state law limiting such purchases).

The same is true here:  Congress provided the Enterprises with broad, unqualified discretion to

issue preferred stock and dividends, thus preempting state statutes that would otherwise limit or

impose conditions on that discretion.

27

Finally, the plain language of the Treasury Stock Certificates clearly states that, even when there is no federal law on point, neither Delaware law nor Virginia law apply "where such law is inconsistent with . . . *any provision of this Certificate*."  Ex. C § 10(e) (Amended Treasury Stock Certificate) (emphasis added).  The Certificates expressly provide for the variable dividend structure called for by the Third Amendment.  *Id*. § 2.  Thus, by the plain terms of the Certificates, no state law can negate it.

**B.      The Third Amendment Complies With the Delaware and Virginia Statutes Upon Which Plaintiffs Rely**

Even if Plaintiffs were correct that the Court should apply state law—and they are not—Plaintiffs fail to state a claim in Counts I and II because the net-worth dividend instituted through the Third Amendment is valid under the Delaware General Corporation Law ("DGCL") and the Virginia Stock Corporation Act ("VSCA").

The DGCL and the VSCA are broad, enabling statutes that permit corporations to issue preferred stock with contractually-defined dividend rights.  The DGCL "provides great flexibility" and "considerable latitude in creating classes of stock," and permits corporations to issue preferred stock that is "entitled to certain preference over other stock."  *Shintom Co. v. Audiovox Corp.*, 888 A.2d 225, 227-228 (Del. 2005).  Section 151(c) of the DGCL simply states that, if a preferred stock provides for dividends, then the holders of that stock "shall be entitled to receive dividends at such rates . . . as shall be stated in" the corporate documents authorizing the issuance of the stock, such as the certificates of incorporation or applicable board resolutions. *See Shintom*, 888 A.2d at 229.  Similarly, the VSCA provides flexibility and does not purport to exhaustively describe the possible preferences, rights, and limitations of classes of stock, so long as they are stated in the authorizing documents.  Va. Code § 13.1-638(A), (F).  The VSCA broadly provides that a corporation may authorize classes or series of shares that "[h]ave

preference over any other class or series of shares with respect to distributions. . . ." *Id*. § 13.1-638(C); *see also Kain v. Angle*, 69 S.E. 355, 357 (Va. 1910).

Here, Plaintiffs argue that the Treasury Stock Certificates, as amended by the Third Amendment, fail to comply with 8 Del. Code 151(c) and Va. Code § 13.1-638(C) because the net worth dividend is not set at a "rate" that is "payable in preference to" other classes of stock. *See* FAC ¶¶ 54, 79-94. Plaintiffs are wrong. Section 13.1-638 of the VSCA allows corporations to issue preferred shares that "[e]ntitle the holders" to dividends "*calculated in any manner*." *See* Va. Code § 13.1-638(C) (emphasis added). Indeed, the VSCA does not even include language that preferred stock dividends must be paid "at such rates," and only provides that corporations may issue shares that "[h]ave preference over any other class or series of shares with respect to distributions. . . . " Va. Code § 13.1-638(C). Likewise, "[t]he Delaware statutory scheme *does not . . . require any particular form of preference*. It allows private parties,"—*i.e.*, the Enterprises (as the issuing corporations) and Treasury (as the purchaser of the preferred stock)— "to contract for preferences between themselves." *Shintom*, 888 A.2d at 230 (emphasis added). The only requirement imposed by Section 151 is that the dividend rates be stated in the authorizing documents—here, the Treasury Stock Certificates. *See id*. at 229; *see also Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del. 1998) ("Any rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute.") (citing 8 Del. Code § 151(a)).

The Third Amendment fully complies with these statutes: the Treasury Stock Certificates, as amended, clearly state that Treasury's preferred stock ranks senior to all other outstanding classes of stock as to dividends, and that the net-worth dividend is calculated every quarter based on the Enterprises' quarterly performances. There is no requirement under Delaware or Virginia

law that the rate used to calculate a dividend be a percentage (although 100% is both a percentage and a rate), and Plaintiffs' proposed interpretation to the contrary is unprecedented and reads into the DGCL and the VSCA restrictive requirements that are contrary to their broad, enabling statutory schemes.  *See Shintom Co., Ltd. v. Audiovox Corp.*, No. Civ. A. 693-N, 2005 WL 1138740, at \*2 (Del. Ch. May 4, 2005), *aff'd* 888 A.2d 225 ("Choosing to set dividend rates at zero is as much an act of setting rates as choosing a substantive rate.").[18]  Moreover, section 151(a) of the DGCL provides that "[a]ny of the . . . preferences, [and] rights [of preferred shares] may be made dependent upon facts ascertainable outside the certificate of incorporation or of any amendment thereto . . . .  The term 'facts' . . . includes . . . the occurrence of any event, including a determination or action by any person or body, including the corporation."  8 Del. C. § 151(a); *see also* Va. Code § 13.1-638(D) ("Any of the terms of shares may be made dependent upon facts objectively ascertainable outside the articles of incorporation . . .").  Thus, it is permissible for a preferred dividend rate to be tied to an interest rate that changes over time (such as LIBOR) or the performance of the corporation (such as its net income for the quarter).

## CONCLUSION

For the foregoing reasons and those in Treasury's brief, FHFA, Fannie Mae, and Freddie Mac respectfully request that the Court dismiss with prejudice all claims asserted against them.

---

[18]  The Court should reject Plaintiffs' claim that the Third Amendment dividend structure is not a legitimate preferred stock because "Treasury's participation in corporate earnings growth is unlimited."  FAC ¶ 83; *see also id.* ¶ 53.  This claim is analogous to the claim that the Third Amendment converted the Senior Preferred Stock into common stock, which the district court in *Perry Capital* correctly rejected with force that applies here as well: "[t]he characteristics of preferred stock 'that distinguish that stock from common stock'—*e.g.*, senior-most dividend and liquidation rights—remain 'expressly and clearly stated' under the Third Amendment."  70 F. Supp. 3d at 238 n.44.  The D.C. Circuit did not reach this issue on appeal because it held that Section 4617(f) barred the claims that Treasury violated HERA's sunset provision with respect to the purchase of new stocks.  *See Perry Capital*, 848 F.3d at 1096-97.

Dated:  April 17, 2017
       Wilmington, DE

      */s/ Robert C. Maddox*

| | |
|---|---|
| Robert J. Stearn, Jr. (No. 2915) | Howard N. Cayne (admitted *pro hac vice*) |
| Robert C. Maddox (No. 5356) | Asim Varma (admitted *pro hac vice*) |
| Richards, Layton & Finger, P.A. | David B. Bergman (admitted *pro hac vice*) |
| 920 North King Street | Arnold & Porter Kaye Scholer LLP |
| Wilmington, DE 19801 | 601 Massachusetts Avenue |
| (302) 651-7700 | Washington, DC 20001 |
| stearn@rlf.com | (202) 942-5000 |
| maddox@rlf.com | Howard.Cayne@apks.com |
| | Asim.Varma@apks.com |
| | David.Bergman@apks.com |

Robert J. Stearn, Jr. (No. 2915)
Robert C. Maddox (No. 5356)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
stearn@rlf.com
maddox@rlf.com

*Attorneys for Defendants Federal Housing Finance Agency, Federal National Mortgage Association, and Federal Home Loan Mortgage Corporation*

Michael Joseph Ciatti
(admitted *pro hac vice*)
Graciela Maria Rodriguez
(admitted *pro hac vice*)
King & Spalding LLP
1700 Pennsylvania Avenue N.W.
Washington, DC 20006
(202) 626-5508
(202) 626-3737
mciatti@kslaw.com
gmrodriguez@kslaw.com

*Attorneys for Defendant Federal Home Loan Mortgage Corporation*

Howard N. Cayne (admitted *pro hac vice*)
Asim Varma (admitted *pro hac vice*)
David B. Bergman (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue
Washington, DC 20001
(202) 942-5000
Howard.Cayne@apks.com
Asim.Varma@apks.com
David.Bergman@apks.com

*Attorneys for Defendant Federal Housing Finance Agency*

Jeffrey W. Kilduff
Michael Walsh
O'Melveny & Meyers LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
jkilduff@omm.com
mwalsh@omm.com

*Attorneys for Defendant Federal National Mortgage Association*